RIO GRANDE PIPELINE COMPANY,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION and United States
of America, Respondents.

Longhorn Partners Pipeline,
L.P., Intervenor.

No. 98–1194.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 21, 1999.

Decided June 8, 1999.

John B. Rudolph argued the cause for petitioner. With him on the briefs was Alex A. Goldberg. Lisa M. Tonery entered an appearance.

Judith Albert, Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. With her on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, John J. Powers, III, and Robert J. Wiggers, Attorneys, Jay L. Witkin, Solicitor, Federal Energy Regulatory Commission, and Susan J. Court, Special Counsel. Samuel Soopper, Attorney, entered an appearance.

Lawrence A. Miller argued the cause for intervenor. With him on the briefs was Kevin Hawley.

Before: EDWARDS, *Chief Judge,* WALD and ROGERS, *Circuit Judge*s.

Opinion for the Court filed by *Chief Judge* HARRY T. EDWARDS.

HARRY T. EDWARDS, *Chief Judge*:

Rio Grande Pipeline Company ("Rio Grande") purchased 194 miles of an existing refined products pipeline from the Na-

vajo Pipeline Company ("Navajo") to deliver natural gas liquids ("NGLs") from the United States to Mexico. In exchange for the pipeline, Rio Grande paid Navajo an agreed sum of money and granted Navajo Southern, Inc., a wholly owned subsidiary of Navajo, a minority interest in Rio Grande. In the proceeding under review, Rio Grande sought to include the purchase price of the pipeline in its rate base. Normally, a purchaser such as Rio Grande is only permitted to include the seller's depreciated original cost in its cost-of-service calculations; however, Rio Grande pointed out that this transaction was different, because the pipeline was purchased for a new use and the purchase price was less than the cost of constructing a comparable facility. Rio Grande therefore contended that it should be permitted to include the full purchase price of the pipeline in its rate base under the so-called "benefits exception" to the original cost rule. The Federal Energy Regulatory Commission ("FERC" or "Commission") denied Rio Grande's request, holding that the benefits exception can *never* be employed when the seller acquires an equity interest in the purchasing entity. Rio Grande petitions for review of this ruling, claiming that FERC's decision is flatly at odds with the benefits rule and that the agency's judgment defies reason.

Before turning to the merits, we must first resolve three threshold issues: (1) whether Longhorn Partners Pipeline ("Longhorn") is a proper intervenor in the matter now before the court, (2) whether Rio Grande has been "aggrieved" by the contested orders, and (3) whether the contested orders are ripe for review. With these threshold issues resolved, we then reach the question of whether FERC's rejection of Rio Grande's request to include the full purchase price of the pipeline in its rate base was arbitrary and capricious.

On the record at hand, we conclude that Longhorn is not a proper intervenor in this action, because it does not have standing.

Indeed, it appears that Longhorn is really seeking to participate as an amicus. Pursuant to our discretion under Rule 29(a) of the Federal Rules of Appellate Procedure, we will accord Longhorn amicus status so that its views on the common issues can be considered. We also conclude that Rio Grande is an aggrieved party, because it faces real and present economic injury as a result of the orders here in dispute. Likewise, because FERC's disputed policy is fully crystallized and raises a concrete legal question, we find that petitioner's claim is ripe for review by this court. Finally, on the merits, we conclude that FERC's refusal to apply the benefits exception in the present case was arbitrary and capricious for lack of an adequate justification. Accordingly, we grant Rio Grande's petition for review.

## I. BACKGROUND

Rio Grande is a partnership formed by two pipeline companies, Juarez Pipeline Company and Amoco Rio Grande Pipeline Company, to construct and maintain an integrated common carrier pipeline to deliver NGLs from the United States to Mexico. As a part of this project, Rio Grande sought to purchase 194 miles of an existing refined products pipeline from Navajo, which would then be converted to NGL service. According to Rio Grande, Navajo's willingness to sell this segment of pipeline "at a reasonable price was directly dependent on its ability to acquire a partnership interest in our project." Statement of William C. Lawson, Management Committee Chairman, Rio Grande, *reprinted in* Joint Appendix ("J.A.") 61. Accordingly, in exchange for the pipeline, Rio Grande agreed to pay an agreed sum of money to Navajo as well as grant Navajo Southern, Inc., a wholly owned subsidiary of Navajo, a minority partnership interest in Rio Grande. Rio Grande asserts, without contradiction, that the price paid for the pipeline, including the value of the partnership interest and the cost of converting and integrating the acquired line,

is at least $8 million less than the cost of constructing a comparable new line. *See id.*

Rio Grande then sought to justify the rates for its new service. Under 18 C.F.R. § 342.2, pipelines may justify an initial rate for new service using one of two methods: the carrier may either (1) file cost, revenue, and throughput data supporting the proposed rate pursuant to § 342.2(a), or (2) file a sworn statement that the proposed rate is agreed to by at least one non-affiliated person who intends to use the service, pursuant to § 342.2(b). Rates justified under § 342.2(b) are simple to put into place, and often become effective without a FERC order addressing them. However, these rates are ineffective if a protest to the initial rate is filed, in which case the carrier must seek a § 342.2(a) justification. Moreover, if a negotiated rate is challenged and a lower rate is found appropriate, the pipeline may have to pay reparations for the amount overcharged. In contrast, a cost supported rate approved under § 342.2(a) is entitled to greater protection. For example, if a challenge is brought to a cost-supported, Commission-approved rate and a reduction is required, that reduction is given only prospective effect. *See generally Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 284 U.S. 370, 387–89, 52 S.Ct. 183, 76 L.Ed. 348 (1932).

In this case, Rio Grande filed a petition for a declaratory order, requesting approval of its initial rates. In its petition, Rio Grande noted that a non-affiliated party, Petroleos Mexicanos ("PEMEX"), had agreed to the proposed initial rate of $1.26 per barrel and, thus, the rates could be justified under § 342.2(b). However, Rio Grande made clear that it was not requesting FERC approval of a negotiated rate under § 342.2(b):

> [W]hether one or twenty "non-affiliated persons" agree to its to-be-filed rate, [Rio Grande] is not assured that it will be able to justify its "initial rate," if challenged, unless it has the Commis-

sion's approval to include its acquisition costs. Regardless of a consignee or shipper's prior agreement to the rate, [Rio Grande's] proposed tariff may be protested. In the event of a protest to a negotiated rate, [Rio Grande] would have to submit "cost, revenue and throughput data supporting such rate" and incur the cost of a lengthy rate proceeding. 18 C.F.R. § 342.2(a) (1995). Accordingly, [Rio Grande] also submits this Petition to establish its rate base and prejustify its rates.

*In re Rio Grande Pipeline Co.*, Verified Petition for Declaratory Order (Oct. 7, 1996), *reprinted in* J.A. 8 (footnote omitted). In support of its request for approval under § 342.2(a), Rio Grande submitted detailed cost-of-service calculations, which included the full purchase price of the new pipeline.

██ Generally, when establishing the cost of service upon which a pipeline's regulated rates are based, FERC employs "original cost" principles. Under these principles, when a facility is acquired by one regulated entity from another, the seller's depreciated original cost is included in the cost-of-service computations, even though the price paid by the purchaser may exceed that amount. *See Northern Natural Gas Co.*, 35 F.E.R.C. ¶ 61,114, at 61,236 (1986). Applying the original cost rule to this case, Rio Grande would not be permitted to include the full purchase price of the pipeline in its rate base; it would only be permitted to include Navajo's depreciated cost of the pipeline. However, the Commission has created an exception to this general rule for cases where it is shown that the "acquisition results in substantial benefits to ratepayers." *Longhorn Partners Pipeline*, 73 F.E.R.C. ¶ 61,355, at 62,112 (1995) ("*Longhorn I*"). Under this "benefits exception," purchased facilities may be included in the rate base at the full purchase price if the purchaser can demonstrate that: (1) the acquired facility is being put to new use, and (2) the purchase price is less than the cost of

constructing a comparable facility. *See id.* at 62,112–13.

In its petition, Rio Grande argued that it had satisfied the requirements of the benefits exception. It explained that, by acquiring the pipeline from Navajo rather than constructing a new one, it had saved at least $8 million. It also explained that the pipeline would be put to a new use, because the transport of NGLs, unlike the transport of refined products, required pressurization, and because the line would serve entirely different markets and shippers than those served by the previous refined products service. Accordingly, Rio Grande argued that it should be allowed to include the full purchase price of the pipeline in its rate base.

FERC denied Rio Grande's request to allow the full purchase price of the acquired line to be included in its cost-of-service calculations, and, thus, rejected the proposed rates under § 342.2(a). *See Rio Grande Pipeline Co.,* 78 F.E.R.C. ¶ 61,020, at 61,082–83 (1997) (*"Rio Grande I"*). In support of this position, FERC explained that "[t]he general rule ... is that the depreciated cost of an acquired asset must be used in cost-of-service calculations where the former owner not only receives the higher price but also has an equity interest in the acquiring company." *Id.* at 61,082. This position was warranted, according to FERC, to ensure that a seller does not "benefit from the higher cost of service on the line, which it cannot do as the owner of a regulated asset at this time." *Id.* (internal quotation marks omitted). FERC noted, however, that since Rio Grande had supplied the affidavit required by § 342.2(b), and no entity had protested the charged rate, Rio Grande was free to charge the proposed rate in its transactions with PEMEX. *See id.* Rio Grande sought rehearing of the decision, which was denied on February 13, 1998. *See Rio Grande Pipeline Co.,* 82 F.E.R.C. ¶ 61,147 (1998) (*"Rio Grande II"*). Rio Grande then timely petitioned for review in this court.

In an entirely separate transaction, Longhorn, like Rio Grande, negotiated a deal to purchase a pipeline segment. And Longhorn similarly agreed to grant an equity interest to the seller of the pipeline segment in addition to the payment of a sum of cash. After its deal had closed, Longhorn sought approval from FERC for the inclusion of the full purchase price of its new asset in its rate base under the benefits exception. The Commission, however, denied Longhorn's request for the same reason it had denied Rio Grande's request: the benefits exception could not apply where a selling entity acquired an equity interest in the purchaser. *See Longhorn Partners Pipeline,* 82 F.E.R.C. ¶ 61,146, at 61,543–44 (1998).

Because of the possible precedential impact on its case, Longhorn sought to intervene in the Rio Grande proceedings before the Commission, but its motion was denied. *See Rio Grande II,* 82 F.E.R.C. at 61,548. In a separate action, Longhorn filed a petition for review of its own case in this court, *Longhorn Partners Pipeline v. FERC,* No. 98–1547 (filed Nov. 17, 1998); however, Longhorn also seeks to maintain intervenor status in the instant case before this court, over the objection of FERC.

## II. ANALYSIS

### A. *Longhorn's Intervenor Status*

■ Longhorn relies principally on 28 U.S.C. § 2348 in support of its motion to intervene. In *City of Cleveland v. NRC,* 17 F.3d 1515, 1517–18 (D.C.Cir.1994) (per curiam), however, this court held that Article III standing is a prerequisite to § 2348 intervention, and it is uncontested that Longhorn lacks Article III standing with respect to the Commission's *Rio Grande II* order. From this, it might be simply concluded that Longhorn cannot intervene under 28 U.S.C. § 2348. The matter is not so simple, however, for in the same year that *City of Cleveland* was issued, the court also issued *American Train Dispatchers Ass'n v. ICC,* 26 F.3d 1157 (D.C.Cir.1994), producing precedent that

can be read as in direct conflict with *City of Cleveland.*

In *Train Dispatchers,* we faced the preliminary question of whether to permit the Railway Labor Executives' Association ("RLEA") to intervene in the proceedings challenging an ICC order although it had not participated at the agency level. The court in *Train Dispatchers* did two things with respect to the intervention question: (1) it held that the court may, in its *discretion,* permit intervention under 28 U.S.C. § 2348, and (2) it expressly allowed RLEA to intervene. *See Train Dispatchers,* 26 F.3d at 1162 ("Thus, even assuming that RLEA is not entitled to intervene as of right here, we may allow it to intervene as a discretionary matter. We choose to do so in this case. . . ."). Were Article III standing a prerequisite to intervention, the court could not have decided, as it did, to "grant RLEA's motion to intervene without deciding whether it has Article III standing." *Id.* This statement makes sense only to the extent that Article III standing is simply irrelevant to (or at least not dispositive of) the discretionary decision to allow intervention. Accordingly, it appears that *City of Cleveland* and *Train Dispatchers* conflict.

■ The only conclusion we can draw from reading these two cases is that the two panels spoke past one another. They rely on different lines of circuit precedent, and neither opinion even acknowledges that the other line exists. Given that our sister circuits are similarly divided, *compare Ruiz v. Estelle,* 161 F.3d 814, 830 (5th Cir.1998) (holding that Article III standing is not a prerequisite to intervention), *Associated Builders & Contractors v. Perry,* 16 F.3d 688, 690 (6th Cir.1994) (same), *Yniguez v. Arizona,* 939 F.2d 727, 731 (9th Cir.1991) (same), *Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir.1989) (same), *and United States Postal Serv. v. Brennan,* 579 F.2d 188, 190 (2d Cir.1978) (same), *with Mausolf v. Babbitt,* 85 F.3d 1295, 1300 (8th Cir.1996) (holding that Article III standing is necessary for interven-

tion), *and United States v. 36.96 Acres of Land,* 754 F.2d 855, 859 (7th Cir.1985) (concluding that intervention under Rule 24 requires interest greater than that of standing), we believe it imperative that we now explain why we conclude that a prospective § 2348 intervenor must have standing to participate as an intervenor rather than only as an amicus curiae.

In *City of Cleveland,* the court denied the Alabama Electric Cooperative's ("AEC") motion to intervene in a dispute between the Nuclear Regulatory Commission ("NRC") and two nuclear power plants as to whether the latter could suspend the antitrust conditions in their operating licenses. Although it lacked Article III standing, in that it had no relationship whatsoever with the petitioners, their competitors, or the geographic market at issue, AEC sought to intervene on the side of the NRC, because it feared that an adverse decision could lead a competitor to seek a similar suspension of its antitrust conditions. In denying AEC's motion, the court relied heavily upon *Southern Christian Leadership Conference v. Kelley,* 747 F.2d 777, 779 (D.C.Cir.1984), wherein the court held that Article III standing is necessary for intervention under Rule 24(a)(2) of the Federal Rules of Civil Procedure. In particular, the court focused upon what it considered the rationale underlying the *Kelley* decision, namely that "because a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, he must satisfy the standing requirements imposed on those parties." *City of Cleveland,* 17 F.3d at 1517. Because a prospective § 2348 intervenor similarly seeks to participate like a party, the court reasoned, it should be treated like a party. Accordingly, as we had held in *Kelley,* it must satisfy the standing requirements imposed on parties.

The *City of Cleveland* court did not differentiate those seeking to intervene with party-like status from those seeking a lesser degree of participation. It instead assumed that prospective intervenors always

sought to participate on an equal footing with the original petitioner. Although the *City of Cleveland* court did not then address the situation we now face, we nevertheless believe that its more general conclusion remains valid: there is no reason to believe that Congress intended to create two tiers of § 2348 intervenors based upon the presence or absence of standing. *See id.*

■ The language of § 2348 alone does not settle the proper relationship between Article III standing and intervention, but the general structure that Congress has provided for appellate review of agency action strongly militates towards reading § 2348 to require Article III standing as a prerequisite to intervention. A party petitioning for review of agency action must have standing, and the intervention rules help to govern which existing suits a prospective party may legitimately join. In this case, Longhorn essentially seeks to participate as an amicus curiae—it sought only to contribute its views to those issues raised by Rio Grande's petition for review and, had Rio Grande ceded some of its oral argument time, to participate in oral argument. *Diamond v. Charles,* 476 U.S. 54, 62–64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), says that an entity lacking Article III standing can do no more than that. As Longhorn readily admits, in the status that it seeks, it could neither petition for rehearing en banc nor petition for certiorari unless Rio Grande first did the same. Thus, for the sake of clarity, simplicity, and administrative rationality, we believe that such limited participation should be accorded in the form of amicus, and not intervenor. Those who possess Article III standing, on the other hand, can either petition for review directly, particularly if they desire to raise any additional issues, or intervene under § 2348, in which case they normally would be limited to the scope of the original petition for review. *See National Ass'n of Regulatory Utility Comm'rs v. ICC,* 41 F.3d 721, 729–30 (D.C.Cir.1994) (stating that only in ex-

traordinary cases will an intervenor be permitted to raise additional issues not raised by petitioners). For those who have participated before the agency, § 2348 explicitly provides that choice, allowing

> any party in interest in the proceeding before the agency whose interests will be affected if an order of the agency is or is not enjoined, set aside, or suspended [to] appear as parties thereto of their own motion and as of right.... Communities, associations, corporations, firms, and individuals, whose interests are affected by the order of the agency, may intervene in any proceeding to review the order.

For those who have Article III standing but failed to participate at the agency level, § 2348 merely permits intervention.

On the record here, there is no doubt that Longhorn is not a proper intervenor. It appears that Longhorn is really seeking to appear as an amicus. Because we have discretion to grant a party such status, *see* FED. R.APP. P. 29(a), we will accord Longhorn amicus status so that its views on the common issues can be considered.

## B. Aggrievement and Ripeness

FERC argues that Rio Grande is not aggrieved by the disputed orders, and that, even if it is aggrieved, the orders are not ripe for review. The Commission is wrong on both counts.

■ A party seeking review of a final Commission order must demonstrate that it has been "aggrieved" by the order. *See* 28 U.S.C. § 2344 (1994).

> Like all parties seeking access to the federal courts, petitioners are held to the constitutional requirement of standing. Common to both these thresholds is the requirement that petitioners establish, at a minimum, injury in fact to a protected interest. To demonstrate injury in fact, petitioners must identify an invasion of a legally protected interest which is (a) con-

crete and particularized, and (b) actual or imminent, not conjectural or hypothetical.

*Shell Oil Co. v. FERC,* 47 F.3d 1186, 1200 (D.C.Cir.1995) (citations and internal quotation marks omitted).

In this case, FERC argues that Rio Grande has not been injured, because Rio Grande may charge the rate it sought· to charge pursuant to § 342.2(b).· However, this conclusion misses the point. Rio Grande filed its petition for a declaratory order specifically because it sought the security of a rate approval under § 342.2(a). FERC's refusal to approve Rio Grande's rate under § 342.2(a) means that the current rate · may be rendered ineffective if any party files a protest. Rio Grande argues that this affects both its present economic behavior—investment plans and creditworthiness—and its future business relationships. In particular, Rio Grande asserts that the orders "have had a profoundly negative effect on the active marketing of [this] project to new potential users," have made existing and potential investors "extremely skeptical over further investment in the project," and have "negatively impact[ed] both [Rio Grande's] ability to raise debt capital and its general creditworthiness." Brief of Rio Grande at 19–20. FERC does not dispute these contentions.

On the record at hand, there can be no serious doubt over Rio Grande's aggrievement by virtue of FERC's orders. As indicated, Rio Grande is suffering present economic injury as a result ·of the orders. *See, e.g., Great Lakes Gas Transmission Ltd. Partnership v. FERC,* 984 F.2d 426, 430 (D.C.Cir.1993) (holding that showing of "present injurious effect on [a petitioner's] business decisions and competitive posture within the industry" is sufficient to prove that petitioner is aggrieved). There can also be no doubt that Rio Grande satisfies the remaining Article III standing requirements, because its injury flows from the FERC orders under review and may be redressed if this court grants its petition

for review. It therefore has standing to petition for review of the FERC orders at issue here.

■ FERC also claims that, even if Rio Grande has been aggrieved and has standing to contest the disputed orders, the case should nonetheless be dismissed as unripe. On this score, FERC contends that Rio Grande's petition is unfit for review, because Rio Grande "has not shown that the contested orders have had any immediate impact on its daily affairs," and · that FERC has "not applied its pronouncements on original cost to any of [Rio Grande's] actual rates." Brief for FERC at 20–21. This is a mangled view of the ripeness doctrine, and we reject it.

■ As we noted in *Mississippi Valley Gas Co. v. FERC,* 68 F.3d 503, 508 (D.C.Cir.1995), in applying the ripeness doctrine,

we are to consider the nature of the challenged issue and inquire whether the agency action is sufficiently final for review. When a petitioner raises a purely legal question, we assume that issue is suitable for judicial review. However, our assessment of the finality of the agency action also includes consideration of whether the agency or the court will benefit from deferring review until the agency's policies have crystallized and the question arises in some more concrete and final form.

(citations and internal quotation marks omitted). In other words, a case is ripe when it "presents a concrete legal dispute [and]· no further factual development is essential to clarify the issues ... [and] there is no doubt whatever that the challenged [agency] practice has 'crystallized' sufficiently for purposes of judicial review." *Payne Enters., Inc. v. United States,* 837 F.2d 486, 492–93 (D.C.Cir. 1988). The Commission is quite wrong in its implicit suggestion that Rio Grande's petition must be dismissed absent a showing of "hardship," for, "under the ripeness doctrine, the hardship prong of the [*Abbott*

*Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ] test is not an independent requirement divorced from the consideration of the institutional interests of the court and agency." *Id.* at 493; *accord City of Houston v. HUD,* 24 F.3d 1421, 1431 n. 9 (D.C.Cir. 1994). Under these well-established principles, the Commission's claim that this case is unripe for review must be rejected.

The record here shows conclusively that this case presents a concrete legal dispute and that FERC's policy is crystallized. In *Rio Grande I,* the Commission stated:

> In this case, whether or not Rio Grande satisfies the two prong test, we must deny its request. That test presupposes a write-up that would be permissible if the test were satisfied. That is not the case here. In this instance, the seller of the acquired line, Navajo, has an equity position in Rio Grande through an affiliate, Navajo Southern, one of the partners of Rio Grande. Rio Grande argues that in this case Navajo Southern's equity interest should not be a bar to the write-up, because it was essential to structuring an agreement acceptable to Navajo so that the project could go forward. The general rule, however, is that the depreciated cost of an acquired asset must be used in cost-of-service calculations where the former owner not only receives the higher price but also has an equity interest in the acquiring company. This is so because otherwise the seller "might benefit from the higher cost of service on the line, which it cannot do as the owner of a regulated asset at this time." Thus, we must deny Rio Grande's request for a write-up.

78 F.E.R.C. at 61,082 (quoting *Longhorn I,* 73 F.E.R.C. at 62,113). In *Rio Grande II,* the Commission reaffirmed its position:

> Here, we have a regulated entity allegedly changing its service and requesting a write-up of the assets dedicated to the new service .... In the absence of Navajo's equity interest, this case might fall within one of the recognized exceptions

to the general rule. However, we need not address this issue because in this case a company is selling the asset to itself. To allow the write-up in this situation would open the door to circumvention of the purpose of the original cost concept.... Accordingly, we will deny rehearing.

82 F.E.R.C. at 61,548. It is clear here that the Commission has decided that the benefits exception cannot be used where a selling entity acquires an equity interest in the purchaser as a result of the transaction, and has applied this new rule by denying Rio Grande's request for approval of its cost-justified rates. Thus, because FERC's orders raise a concrete legal dispute regarding a policy that has crystallized to its final form, the orders are ripe for review.

### C. The Merits

■ We now turn to the merits of Rio Grande's challenge: FERC's refusal to apply the benefits exception based on Navajo's equity interest in Rio Grande. We review the Commission's orders under the usual arbitrary and capricious standard. *See Williston Basin Interstate Pipeline Co. v. FERC,* 165 F.3d 54, 60 (D.C.Cir. 1999); 5 U.S.C. § 706(2)(A) (1994). In this context, our role is "limited to assuring that the Commission's decisionmaking is reasoned, principled, and based upon the record." *Pennsylvania Office of Consumer Advocate v. FERC,* 131 F.3d 182, 185 (D.C.Cir.1997) (citations and internal quotation marks omitted).

■ Rio Grande argues that the Commission acted arbitrarily and capriciously, because it did not adequately explain its refusal to permit the inclusion of the full cost of the acquired line in Rio Grande's rate base. We agree.

As noted above, normally when a facility is acquired by one regulated entity from another, the purchaser may only include the seller's depreciated original cost in its rate base, even though the price paid by the purchaser may exceed that amount.

However, under the benefits exception, the Commission has permitted the purchasing pipeline to include the full purchase price of an acquired asset in its cost-of-service computations if the pipeline can show that: (1) an acquired facility is being put to new use, and (2) the purchase price is less than the cost of constructing a comparable facility. *See Longhorn I*, 73 F.E.R.C. at 62,-112–13.

In its orders below, FERC did not even reach the question of whether Rio Grande satisfied the two-prong exception; instead, it concluded that the exception could not be employed where the seller acquires an equity position in the purchaser: "[t]he general rule. . .is that the depreciated cost of an acquired asset must be used in cost-of-service calculations where the former owner not only receives the higher price but also has an equity interest in the acquiring company." *Rio Grande I*, 78 F.E.R.C. at 61,082. On rehearing, FERC did not waver from this position, stating that it considered the deal between Rio Grande·and Navajo one in which the "company is selling the asset to itself." *Rio Grande II*, 82 F.E.R.C. at 61,548.

The Commission now claims that it has simply interpreted its original cost rule and the exception thereto. This selfserving explanation cannot carry the day. The Commission in this case has effectively *added* a new *per se* exclusion to the application of the benefits exception when an asset's seller acquires an interest in the purchaser. The creation of this *per se* exception makes no sense and, indeed, FERC cites no established authority or plausible reasons in support of it.

First, on its face, the retention of some interest in the acquired facilities in lieu of a money payment will reduce the cost basis included in Rio Grande's rate base and, thus, rates will be lower than if the facilities were sold solely for money. This result would appear to be in the public interest. Reduced rates result because, as Rio Grande made clear at oral argument, the amount it seeks to include in its rate base is only the total amount of money paid and does not include the value of any equity interest. Thus, in a situation such as this, if a company will sell its facility for $100 outright or $80 plus a 5% equity interest, the better deal for the ratepayer is the $80–plus-equity deal, because $80, rather than $100, may be included in the rate base.

Moreover, it is clear that Rio Grande has put the pipeline to a *new use*: transportation of NGLs. From the perspective of an acquiring entity, concepts of "depreciation" are normally inapposite in such circumstances. Thus, it hardly makes sense for FERC to require the use of a depreciated figure in this situation where the use is brand new.

The Commission stated in *Rio Grande II* that "[t]o allow [a] write-up in this situation would open the door to circumvention of the purpose of the original cost concept." 82 F.E.R.C. at 61,548. Although this is a valid concern, the door was already opened to this possibility when FERC permitted the benefits exception in the first place. And to the extent that FERC is worried about sham transactions where equity interests are involved, no party has claimed that every transaction of the sort at issue here is unethical and a sham. Indeed, there does not appear to be any difference between a deal of this sort and one in which a seller receives money for the asset, but later uses that money towards the acquisition of an interest in the purchaser. Presumably, this second deal would qualify for consideration under the benefits exception, since the seller did not become affiliated with the purchaser as a result of the sale. However, the Commission has not explained why the first deal is cause for such concern that it may never qualify for the benefits exception, whereas the second deal may. In addition to this apparent inconsistency, it is also not clear how there could even be sham transactions, given the requirement that there must be a *new use* for the

facility, and that the purchase price must be less than the cost of building anew.

To the extent that the Commission is troubled by these transactions, there are surely ways, short of a *per se* exclusion, to ensure that the deal was negotiated at arm's length. In fact, it is difficult to discern why the Commission would not consider other possibilities short of prohibiting the application of the benefits exception to these sorts of deals, when limiting purchasers to all-cash deals could result in higher prices and thus harm to ratepayers. Arguably, the Commission might decide that a *per se* rule or even a substantially more rigid version of the benefits test is appropriate based on reasoned findings regarding affiliate transactions. However, we need not address these possibilities; as it now stands, the Commission's orders defy good reason. We therefore reverse and remand this case to the Commission for further consideration.

III. Conclusion

For the foregoing reasons, we deny Longhorn intervenor status in this proceeding, but grant it amicus status. We also grant Rio Grande's petition for review and remand for further proceedings consistent with this opinion.

*So ordered.*