# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 01–1314 September Term, 2002

Filed On: March 5, 2003

IDAHO POWER COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ARIZONA PUBLIC SERVICE COMPANY,
INTERVENOR

**BEFORE**: Edwards, Randolph, and Tatel, Circuit Judges

## O R D E R

Upon consideration of intervenor's petition for rehearing filed January 27, 2003, and respondent's response thereto; petitioner's motion for leave to exceed the page limits, and the lodged opposition, it is

**ORDERED** that the motion for leave to exceed the page limits be granted. The Clerk is directed to file the lodged document. It is

**FURTHER ORDERED** that the petition be granted. It is

**FURTHER ORDERED** that the opinion in *Idaho Power Co. v. FERC*, 312 F.3d 454 (D.C. Cir. 2002), be amended as follows:

Delete the last sentence of the opinion and insert in lieu thereof:

The case is remanded to FERC for consideration of the appropriate remedy in light of this opinion.

**<u>Per Curiam</u>**

**FOR THE COURT:**

Mark J. Langer, Clerk

BY:

Michael C. McGrail
Deputy Clerk

Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 15, 2002        Decided December 13, 2002

No. 01-1314

IDAHO POWER COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ARIZONA PUBLIC SERVICE COMPANY,
INTERVENOR

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Charles G. Cole* argued the cause for petitioner. With him on the briefs were *Gary A. Morgans* and *Alice E. Loughran*.

*Larry D. Gasteiger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on

───────

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*John D. McGrane* was on the brief for intervenor.

Before: EDWARDS, RANDOLPH and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: Petitioner, Idaho Power Company, challenges two FERC orders barring Idaho Power from entering into a 10-year contract to provide electricity to the IP Merchant Group ("IP Merchant") from December 2000 through December 2010. *See Idaho Power Co.*, Order Denying Petition for Declaratory Order, 94 F.E.R.C. ¶ 61,311 (2001) ("*Order Denying Petition*"); *Idaho Power Co.*, Order Denying Rehearing and Clarifying Prior Order, 95 F.E.R.C. ¶ 61,224 (2001) ("*Order Denying Rehearing*"). Before receiving the ill-fated bid from IP Merchant, Idaho Power had been furnishing electric transmission service to the Arizona Public Service Company ("APS"). APS had a "right of first refusal" to match the IP Merchant bid for service from Idaho Power. In order to exercise its right of first refusal, APS had to "agree to accept a contract term at least equal to [the] competing request" offered by IP Merchant in its bid for transmission service from Idaho Power. Idaho Power Company Open Access Transmission Tariff § 2.2 ("Idaho Power OATT"), Joint Appendix ("J.A.") 230. However, because it could only seek service from Idaho Power in 18-month increments, APS was unable to match IP Merchant's 10-year contract bid. FERC nonetheless ruled that Idaho Power was obliged to continue providing service to APS, because the "transmission service requests were not substantially the same in all respects [due to] the dissimilarity in available terms of service." *Order Denying Rehearing*, 95 F.E.R.C. at 61,759. In other words, FERC reasoned that the offers by APS and IP Merchant were not "substantially the same in all respects," and thus not competing bids, because IP Merchant offered a 10-year term while APS offered only an 18-month term. *Order Denying Petition*, 94 F.E.R.C. at 62,145; *Order Denying Rehearing*, 95 F.E.R.C. at 61,759.

3

FERC's interpretation of the right of first refusal provision defies reason. Idaho Power's Open Access Transmission Tariff ("OATT") and FERC's orders creating the applicable *pro forma* tariff provide that, in order to exercise a right of first refusal, "the existing firm service customer must agree to accept a contract term at least equal to a competing request by any new Eligible Customer." Idaho Power OATT § 2.2, J.A. 230; *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*; *Recovery of Standard Costs by Public Utilities and Transmitting Utilities*, Order No. 888-A, F.E.R.C. Stats. & Regs. ¶ 31,048 (1997) ("Order No. 888-A"). FERC has turned the Tariff and orders on their heads by suggesting that the competitor must put forward an offer identical to the incumbent's in order for the competing bids to be "substantially the same in all respects." Under this reasoning, the competitor is not allowed to make a *better* offer, which of course ensures that the incumbent never loses. This is a nonsensical construction of the "right of first refusal," which we reject as arbitrary and capricious. Accordingly, we grant Idaho Power's petition for review.

## I. BACKGROUND

### A. The *Pro Forma* Tariff

In 1996, FERC promulgated a set of rules designed to create a more competitive environment in the electric utility industry. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, F.E.R.C. Stats. & Regs. 31,036 (1996) ("Order No. 888"), *order on reh'g*, Order No. 888-A, *order on reh'g*, Order No. 888-B, 81 F.E.R.C. 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 F.E.R.C. 61,046 (1998), *aff'd in part and remanded in part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd jurisdictional ruling sub nom. New York v. FERC*, 535 U.S. 1 (2002). These rules required each utility to separate its transmission function from its wholesale

merchant function (*i.e.*, the selling of electric power at whole-sale rates). They also required each utility to file and take transmission under an OATT designed to assure access to transmission service on a non-discriminatory basis. FERC's rules specified the terms of a *pro forma* tariff designed to achieve the competitive goals of Order No. 888. Order No. 888 at 31,926-64. With limited exceptions, each utility's OATT must conform to the non-rate terms and conditions specified in the *pro forma* tariff. *Report of the Committee on Electric Utility Regulation*, 18 ENERGY L.J. 197, 200 (1997) ("The FERC will allow deviations from the *pro-forma*'s terms and conditions to reflect regional practices, but these deviations are limited primarily to scheduling deadlines. With very limited exceptions, the FERC has rejected all other deviations . . . ."). FERC revised the *pro forma* tariff in Order No. 888-A.

The *pro forma* tariff required each utility to create an Open Access Same Time Information System ("OASIS"), an electronic system for accepting transmission requests that would make them known simultaneously to all potential customers. While § 13.2 of the *pro forma* tariff specified that requests for long-term firm service would generally be accepted in the order in which they are received, Order No. 888-A at 30,515-16, it also noted a special provision in § 2.2 for determining priority where an incumbent customer seeks to renew service. *Id.* at 30,516.

Section 2.2 of the tariff provided the incumbent customer with a right of first refusal to match the duration offered by a new customer at the full OATT rate. Section 2.2 provides, in relevant part:

> If at the end of the contract term, the Transmission Provider's Transmission System cannot accommodate all of the requests for transmission service the existing firm service customer must agree to accept a contract term at least equal to a competing request by any new Eligible Customer and to pay the

> current just and reasonable rate, as approved by the Commission, for such service.

*Id.* at 30,511. FERC explained in the Preamble to the *pro forma* tariff in Order No. 888-A that, "[b]ecause the purpose of the right of first refusal provision is to be a tie-breaker, the competing requests should be substantially the same in all respects." *Id.* at 30,198.

## B. The Transmission Service Requests

Idaho Power provides transmission service in accordance with the rates, terms and conditions of its OATT. Idaho Power filed its OATT pursuant to FERC Order No. 888, and FERC accepted it as the filed rate. *Atlantic City Elec. Co.*, 77 F.E.R.C. ¶ 61,144 (1996) (non-rate terms and conditions); *Allegheny Power Sys., Inc.*, 80 F.E.R.C. ¶ 61,143 (1997) (rates). Idaho Power revised its OATT pursuant to Order No. 888-A, and FERC accepted the revisions. Idaho Power's OATT is substantially the same as the *pro forma* tariff that FERC issued. Significantly, § 2.2 of Idaho Power's OATT is identical to § 2.2 of the *pro forma* tariff.

APS is Idaho Power's incumbent customer, receiving service from Borah/Brady Substation in southeastern Idaho, through Brownlee Substation in western Idaho, to the La-Grande Substation in northeastern Oregon. The history surrounding the dealings between APS and Idaho Power is somewhat convoluted. In 1998, APS submitted several requests through Idaho Power's OASIS for long-term, point-to-point transmission service for an eight-year period. The following year, Idaho Power provided APS with a facility study that demonstrated that existing long-term obligations prevented Idaho Power from meeting APS's service request for the full eight-year period without constructing facility upgrades. Idaho Power offered APS 100 MW of transmission service on Borah West that PacifiCorp had contractual rights to use, but could not due to system limitations. However, Idaho Power cautioned that this service would terminate when PacifiCorp upgraded the facilities and exercised its pre-existing rights to the capacity.

After further negotiations between Idaho Power and APS failed to yield an executed service agreement, FERC directed

Idaho Power to provide APS with partial interim transmission service. *Idaho Power Co.*, Order Rejecting Unexecuted Service Agreements, and Requiring the Filing of New Service Agreements and the Provision of Partial Interim Transmission Service, 90 F.E.R.C. ¶ 61,009 (2000). Since Idaho Power's facility study indicated that it could provide 100 MW of APS's requested firm point-to-point service for a term of 18 months rather than the eight years that APS requested, FERC required Idaho Power to file new service agreements providing APS with firm transmission service for an 18-month term. *Id.* at 61,019. FERC also stated that APS would be entitled to roll over its service at the end of the 18-month term, if it chose not to construct additional facilities and the capacity committed to PacifiCorp remained available. *Id.* This FERC order effectively restricted APS's ability to bid to 18-month increments.

Subsequently, on November 8, 2000, IP Merchant submitted a request on Idaho Power's OASIS for 200 MW of long-term firm point-to-point transmission service for the period December 1, 2000 through December 31, 2010. The following day, APS sent a letter to Idaho Power stating that it was exercising its rollover rights for an additional 18-month period from April 1, 2001 through September 30, 2002. Then on November 15, 2000, IP Merchant submitted a second request on Idaho Power's OASIS for an additional 200 MW of long-term firm point-to-point transmission service. This service was also from the Idaho Power system to LaGrande, for a 10-year period from January 1, 2001 to December 31, 2010.

On December 20, 2000, Idaho Power advised APS of its right of first refusal. Idaho Power simultaneously informed APS that it was filing a Petition for Declaratory Order. The Petition requested guidance as to whether, if APS submitted a 10-year or longer request for which the continuation of service beyond 18 months would be contingent on the continuing availability of capacity over Borah West, this contingent request would be sufficient to match the 10-year, non-contingent IP Merchant request. In response to the Petition, APS questioned the validity of the IP Merchant transmission requests in light of the fact that they were not "precon-

firmed" requests, no service agreements had been executed, and no facilities study agreements or financial commitments had been proffered. Arizona Public Service Company's Motion to Intervene, Protest and Request for Expedited Consideration at 14-16, 19 n.39, *Idaho Power Co.*, 94 F.E.R.C. ¶ 61,311 (2001), J.A. 78-80, 83 n.39. APS also argued that, since it is "willing to match the Idaho Merchant Group's term of 10 years, and to extend it for an additional 5 years, for a term from April 1, 2001 through March 31, 2016, to the extent necessary for APS to retain service," it should prevail over IP Merchant under OATT's tie-breaking mechanism. *Id.* at 19, J.A. 83. However, APS did not seek a waiver from FERC's order limiting it to 18-month terms so that it could compete fully against IP Merchant in exercising its right of first refusal.

## C. FERC's Orders

Despite the shorter term offered by APS, FERC ruled in its initial order that APS could roll over its contract. FERC acknowledged that the priority rule was designed to "provide[ ] a mechanism for allocating transmission capacity when there is insufficient capacity to accommodate all requesters." *Order Denying Petition*, 94 F.E.R.C. at 62,144. However, FERC stated that, under Order No. 888-A, the two customers' requests had to be " '*substantially the same in all respects*' " in order to be competing. *Id.* at 62,145 (quoting Order No. 888-A at 30,197) (emphasis in original). FERC found that the two requests were not, in fact, substantially the same: Instead, it found them to be "vastly different," primarily because they flowed in different directions and used different portions of the Idaho Power system. *Id.* FERC also noted that "the dissimilarity in available terms of service also supports the variant nature of the two customers' transmission service requests." *Id.* FERC further noted that APS expressed an intention to match the IP Merchant Group's 10-year offer, but was restricted from doing so by a prior FERC order. *Id.* Since FERC found that the requests were not substantially the same in all respects, the agency ruled that they were not competing. It thus ordered Idaho Power to give the available 75 MW to APS. *Id.*

Idaho Power petitioned for rehearing. It first noted that a central factual premise for FERC's order – that the two requests flowed in different directions and used different portions of the Idaho Power system – was incorrect. Rather, the requests flowed in the same direction over the 80-mile line in dispute. Further, Idaho Power argued that, because APS had not matched the IP Merchant Group's offer, the IP Merchant Group should be the priority applicant.

FERC denied Idaho Power's request for rehearing. It retreated from its reliance on the alleged physical differences between the services, stating that, while it had "discussed the physical differences between the transmission service requests, our primary rationale for determining that the transmission service requests were not substantially the same in all respects was the dissimilarity in available terms of service." *Order Denying Rehearing*, 95 F.E.R.C. at 61,759. Since APS was limited to 18-month increments, FERC reasoned that "to permit IP Merchant's longer term service request to obtain transmission capacity at the expense of Arizona Public Service would inappropriately disadvantage an existing transmission customer." *Id.* Thus, FERC awarded the 75 MW of service to APS, for the 18-month period ending September 30, 2002. Idaho Power now petitions this court for review.

## II. ANALYSIS

### A. Standing

The first issue we must address is whether Idaho Power possesses constitutional standing to challenge FERC's orders. FERC argues that Idaho Power suffered no "injury in fact" because the utility cannot prove that FERC's orders will cause any monetary loss. We reject this argument.

The two principal forms of standing are "Article III (case or controversy)" and "prudential." Article III standing entails three requirements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest

which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted); *see also El Paso Natural Gas Co. v. FERC*, 50 F.3d 23, 26 (D.C. Cir. 1995) (describing the requirements for demonstrating an injury in fact).

FERC's only standing argument is that Idaho Power suffered no injury in fact because the utility cannot prove that FERC's orders will cause it to lose any profits. FERC points out Idaho Power's statement that FERC's orders required it "to enter into a contract that, for an eighteen-month period, would generate $1,312,875, and forgo entering into a ten-year contract that would yield $8,752,500," Br. of Petitioner at 28, and states that the two amounts, adjusted for time differential, are equivalent. Thus, at least for the next 18 months, FERC argues that "petitioner is in exactly the same position revenue-wise, regardless of which contract it is required to accept." Br. of Respondent at 23.

This argument is meritless. Idaho Power has suffered an injury in fact because FERC's orders bind it to an 18-month contract with APS and preclude it from entering a long-term 10-year contract with IP Merchant.

As a general matter, in a perfectly competitive market, a long-term contract incorporates a premium for stability, and a pipeline naturally values a longer-term transportation contract more highly, *ceteris paribus. . . .* If the maximum approved rate artificially limits a rival shipper's ability to outbid the existing shipper, the rival shipper may offer a

> higher-value contract by bidding up the contract duration instead.

*United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1140 (D.C. Cir. 1996). "[T]he reality [is] that contract duration is a measure of value." *Id*. Because Idaho Power possesses a legally-protected interest in entering a longer-term contract, it suffered a cognizable injury when it was compelled to forgo a 10-year contract with IP Merchant and instead enter a shorter-term contract with its associated market risks. That injury was immediate, concrete, and particularized.

We have previously recognized that an agency ruling that replaces a certain outcome with one that contains uncertainty causes an injury that is felt immediately and confers standing. In *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533 (D.C. Cir. 1999), petitioner Rio Grande Pipeline Company could either justify the rates for its service through 18 C.F.R. § 342.2(a), in which it was required to "file cost, revenue and throughput data supporting the proposed rate," or through § 342.2(b), which required only "a sworn statement that the proposed rate is agreed to by at least one non-affiliated person who intends to use the service." *Rio Grande Pipeline Co.*, 178 F.3d at 536. The major advantage to the former provision was that rates justified under § 342.2(b) were ineffective if a protest to the initial rate was filed; after the protest, the carrier would be required to seek a § 342.2(a) justification. *Id*. Rio Grande requested FERC approval pursuant to § 342.2(a). FERC denied this request. However, the agency "noted . . . that since Rio Grande had supplied the affidavit required by § 342.2(b), and no entity had protested the charged rate, Rio Grande was free to charge the proposed rate in its transactions." *Id*. at 537. When Rio Grande petitioned this court for review, FERC argued that the petitioner had suffered no injury in fact, because it remained free to establish the same rates under § 342.2(b). *Id*. at 539-40. However, we found that FERC's orders caused the petitioner a "present economic injury" because approval under that section left the rates open to challenge at any time by third parties, while approval under § 342.2(a) would have afforded greater certainty. *Id*. at 540.

FERC argues that Idaho Power is unlikely to suffer any economic loss in the future because at least three parties –

APS, the IP Merchant Group, and PacifiCorp – have expressed an interest in using that capacity for the extended 10-year period. However, the energy markets are notoriously volatile. *See* Andrew S. Katz, *Using the EEI-NEM Master Contract to Manage Power Marketing Risks*, 21 ENERGY L.J. 269, 271 (2000); *With Tariff Modifications, Pipelines Move to Reduce Credit Risk*, INSIDE F.E.R.C., Aug. 26, 2002, LEXIS, News Library, News Group File (explaining that three gas pipelines' move to amend their tariffs to include greater protection from "noncreditworthy" customers "[h]ighlight[s] the increasingly volatile nature of energy markets and companies"). Even if market volatility did not diminish these parties' interest in Idaho Power's capacity, it could doubtlessly diminish the profits that Idaho Power could obtain in the future. FERC's arguments to the contrary do not correspond with the reality of the energy markets.

The bottom line is that it is inconceivable that Idaho Power could be subjected to a FERC order requiring it to enter into a specific contract concerning the use of its property but lack standing to challenge that order. *See Green v. McElroy*, 360 U.S. 474, 493 n.22 (1959) (noting that there is generally standing to enforce "a legally protected right to be free from arbitrary interference with private contractual relationships"); *see also Lujan*, 504 U.S. at 561-62 (noting that "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury" when "the plaintiff is himself an object of the action (or forgone action) at issue").

## B. FERC's Orders

In general, this court "gives substantial deference to [FERC's] interpretation of filed tariffs, 'even where the issue simply involves the proper construction of language.'" *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814 (D.C. Cir. 1998) (quoting *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987)).

> We first look to see if the language of the tariff is unambiguous—that is, if it reflects the clear intent of the parties to the agreement. If the tariff language is ambiguous, we defer to the Commission's

> construction of the provision at issue so long as that construction is reasonable.

*Koch Gateway Pipeline Co.*, 136 F.3d at 814. If the tariff's language is unambiguous, this court need not defer to FERC's interpretation. After all, "a court need not accept 'an agency interpretation that black means white. However, if the choice lies between dark grey and light grey, the conclusion of the agency . . . will have great weight.'" *Nat'l Fuel Gas Supply Corp.*, 811 F.2d at 1572 (quoting *Consol. Gas Supply Corp. v. FERC*, 745 F.2d 281, 291 (4th Cir. 1984)) (ellipses added). It is also well understood that no deference is due if FERC's interpretation is inconsistent with prior agency interpretations. *Id.* at 1571 ("If the agency's interpretation of a contract has vacillated, deference might give the agency license to act arbitrarily by making inconsistent decisions without justification.").

In this case, we reject FERC's interpretation of the "right of first refusal," because it is inconsistent with prior agency interpretations and, also, because it is nonsensical. It would be a great challenge indeed to devise a more backward interpretation of the tariff than that which FERC urges on the court. FERC essentially contends that § 2.2 of the *pro forma* tariff and Idaho Power's OATT precludes a competitor from coming forward with a *better* offer than the incumbent's present deal. This interpretation runs contrary to the text of Idaho Power's OATT, FERC Orders No. 888 and 888-A, and the agency's own prior interpretations.

### 1. *Idaho Power's OATT*

FERC's interpretation is directly at odds with the language and logic of § 2.2 of Idaho Power's OATT. The OATT provides that if "the Transmission Provider's Transmission System cannot accommodate all of the requests for transmission service the existing firm service customer must agree to accept a contract term at least equal to a competing request by any new Eligible Customer." Idaho Power OATT § 2.2, J.A. 230. The OATT does not provide that the competing request must be "substantially the same in all respects" as the incumbent's proposed rollover. In fact, the definition

contained in the tariff is consistent with the ordinary meaning of "competing." The generally accepted definition of "compete" is "to seek to strive for something (as a position, possession, reward) for which others are also contending." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 463 (1993). Likewise, the language of the tariff suggests that two offers are competing if there is an inability to accommodate both.

FERC's interpretation of the tariff would nullify the language in § 2.2 which provides that, when two requests are competing, the incumbent customer must *change* the term of its request to at least equal the new eligible customer's request. The agency's interpretation holds that "the dissimiliarity in available terms of service" means that the incumbent has no obligation to match the longer-term competitive bid. *Order Denying Rehearing*, 95 F.E.R.C. at 61,759. Under this interpretation, the incumbent would never have to change its term of service to match the competitor's superior offer; rather, the utility could not consider the competitor's offer precisely *because* it is better. This interpretation is not only nonsensical; it also relieves the incumbent of any obligation to "agree to accept a contract term at least equal to a competing request." A tariff should not be interpreted in a manner that renders one of its terms meaningless. *Great Lakes Gas Transmission Ltd. P'ship*, 93 F.E.R.C. ¶ 61,008 at 61,019 & n.8 (2000). The fact that FERC's orders directly conflict with the plain meaning of the tariff alone merits a reversal.

### 2. *FERC Orders No. 888 and 888-A*

FERC's orders also conflict with and misinterpret Orders No. 888 and 888-A. The Preamble to Order No. 888 provides that the incumbent must match the challenger's longer proposed term – not that the challenger must come forward with an offer identical to the incumbent's. It states that for an existing customer to renew its service, "the existing customer must agree to match the rate offered by another potential customer . . . and to accept a contract term at least as long as that offered by the potential customer." Order No. 888 at 31,665. Moreover, the Preamble does not suggest that two

offers are competing when they are identical. Instead, it supports the classical definition of competition by stating that the incumbent's obligation to match the term and price of the new customer's service request arises when "not enough capacity is available to meet all requests for service." *Id*. There is no suggestion that the two requests must be substantially the same in all respects for this obligation to apply.

Order No. 888-A also contradicts FERC's interpretation. A number of transmission customers had sought changes to the tariff, because, they claimed, "the Commission's right of first refusal provision fails to adequately protect existing transmission customers' rights to continued service." Order No. 888-A at 30,195. FERC rejected these complaints and retained the matching requirements of § 2.2:

> We reject arguments to modify the requirement in section 2.2 that existing long-term firm transmission customers seeking to exercise their right of first refusal must agree to a contract term at least as long as that sought by a potential customer. The objective of a right of first refusal is to allow an existing firm transmission customer to continue to receive transmission service under terms that are just, reasonable, not unduly discriminatory, or preferential. Absent the requirement that the customer match the contract term of a competing request, utilities could be forced to enter into shorter-term arrangements that could be detrimental from both an operational standpoint (system planning) and a financial standpoint.

*Id*. at 30,197-98. Order No. 888-A thus states clearly and unambiguously that the incumbent must match the new potential customer's superior offer.

FERC's notion that the challenger's offer must be substantially the same in all respects to the incumbent's rollover provision is, in fact, based on a gross misinterpretation of one sentence in Order No. 888-A. Examining the full context of Order No. 888-A's statement that the two offers must be "substantially the same in all respects" makes FERC's error apparent. The quoted language appears in a paragraph in

which FERC rejected the arguments of incumbent customers that it could be difficult for them to match the challenger's superior offer. The National Rural Electric Cooperative Association had argued that the incumbent's obligation to match the price offered by another customer should be capped at the maximum transmission rate that the incumbent customer is obligated to pay prior to the end of its contract term. *Id*. at 30,196. FERC responded:

> The fact that existing customers historically have been served under a particular rate design does not serve to "grandfather" that rate methodology in perpetuity. Because the purpose of the right of first refusal provision is to be a tie-breaker, the competing requests should be substantially the same in all respects.

*Id*. at 30,198. It is clear from this passage that FERC was imposing a requirement for the *existing customer* to come forward with an offer substantially the same in all respects to the challenger's, rather than requiring that the challenger come forward with an offer substantially the same in all respects to the incumbent's contract terms. The challenged orders thus directly conflict with Orders No. 888 and 888-A, and grossly misinterpret the language in Order No. 888-A.

### 3. *Prior FERC Interpretations*

The petitioner also points out that FERC's reasoning in this case is flatly inconsistent with the agency's decisions interpreting § 2.2 of the *pro forma* tariff. FERC has ruled repeatedly that § 2.2 requires the incumbent to match the term of service offered by the new customer.

For example, in *Dynegy Power Marketing, Inc. v. Ameren Services Co.*, 93 F.E.R.C. ¶ 61,201 (2000), the agency directed the transmission provider to grant the incumbent's request to roll over its service, provided that there were no competing requests for the service. In discussing potential offers from challengers, FERC stated that "[i]f there is a competing request with a term exceeding [the incumbent's] request, [the incumbent] has the right of first refusal to match the competing request or to forfeit its own request." *Id*. at 61,665 n.12.

FERC has consistently adopted this interpretation of § 2.2 of the *pro forma* tariff. *See*, *e.g.*, *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, 101 F.E.R.C. ¶ 61,104, 2002 F.E.R.C. LEXIS 2234, at *15 ("The Commission requires existing customers to match the term of competing requests for service so that utilities will not be forced to enter into shorter-term agreements."); *Wisconsin Pub. Power Inc. SYS. v. Wisconsin Pub. Serv. Corp.*, 84 F.E.R.C. ¶ 61,120, at 61,656 (1998) (holding that the incumbent must match the challenger's competing term). FERC does not cite a single case to the contrary. Thus, we must conclude that in addition to doing violence to the language of the tariff and the agency's prior orders, the challenged orders are inconsistent with prior and subsequent agency interpretations of § 2.2 of the *pro forma* tariff.

### 4. *APS's System Constraints*

Finally, FERC suggests that APS should not be required to match IP Merchant's longer term offer, because APS was limited to 18-month terms caused by system constraints. *See Order Denying Petition*, 94 F.E.R.C. at 62,145 ("To say that OATT Section 2.2 controls would create a situation where an offer to match a longer service term is unattainable."). However, neither Idaho Power's OATT nor the FERC orders creating the *pro forma* tariff excuse the incumbent from matching a competitor's offer on these grounds. Nowhere does the tariff state that an incumbent who cannot match a competing bid due to system constraints or contractual restraints nevertheless has the right to roll over its contract for a shorter term than the challenger offers. FERC has not pointed to any phrase in the language of the tariff that would authorize such an exception.

Furthermore, the history of the *pro forma* tariff makes it clear that FERC intended no such exceptions. When some parties sought rehearing of Order No. 888 on the grounds that its rule for incumbents was too strict, FERC rejected their efforts to secure exceptions. Order No. 888-A at 30,196-97. The agency stated, "We reject arguments to modify the

requirement in section 2.2 that existing long-term firm transmission customers seeking to exercise their right of first refusal must agree to a contract term at least as long as that sought by a potential customer." *Id.* at 30,197. Moreover, the agency "reject[ed] the proposition that either existing wholesale customers or transmission providers providing service to retail native load customers should be insulated from the possibility of having to pay an increased rate for transmission in the future." *Id.* at 30,198. FERC insisted on this rule even when some utilities claimed that adherence to it would place them at a competitive disadvantage. *Id.* at 30,196.

Thus, it does not matter that APS was limited to 18-month increments due to system constraints at Borah West and preexisting rights possessed by PacifiCorp. These are economic factors that may always affect an incumbent's ability to exercise a right of first refusal. However, these contingencies of the marketplace do not alter the substantive parameters of the right of first refusal.

## III. CONCLUSION

Accordingly, for the reasons enumerated above, Idaho Power's petition for review is hereby granted. FERC's orders are reversed and vacated. The case is remanded to FERC for consideration of the appropriate remedy in light of this opinion.