# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 19, 2010         Decided April 13, 2010

No. 09-1121

MISSOURI PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MUNICIPAL GAS COMMISSION OF MISSOURI, ET AL.,
INTERVENORS

---

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

---

*Lera L. Shemwell* argued the cause for petitioner. With her on the briefs were *Samuel D. Ritchie*, *Kathleen L. Mazure*, and *Jason T. Gray*.

*Holly E. Cafer*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Thomas R. Sheets*, General Counsel, and *Robert H. Solomon*, Solicitor.

Before: HENDERSON and GARLAND, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In June 2006, Missouri Interstate Gas, LLC ("MIG"), along with two state-regulated intrastate pipelines, Missouri Gas Company, LLC ("MGC") and Missouri Pipeline Company, LLC ("MPC"), applied to the Federal Energy Regulatory Commission ("FERC" or "Commission") for a certificate of public convenience and necessity ("certificate") pursuant to § 7 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(c), to reorganize into one interstate, federally regulated natural gas company called MoGas Pipeline, LLC ("MoGas"). After approving the merger and issuing the certificate, the Commission authorized initial rates for service on the combined facilities of the new entity. The Missouri Public Service Commission ("MoPSC") challenged MoGas's proposed initial rates on a number of grounds. These included claims that the proposed rates passed on to consumers contained certain "acquisition premium" costs associated with asset purchases by MIG as well as acquisition premiums associated with MGC and MPC. Under established FERC precedent, such premiums are disallowed, unless the agency applies the so-called "benefits exception." *See Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 536-37 (D.C. Cir. 1999); *Kan. Pipeline Co.*, 81 F.E.R.C. ¶ 61,005 (1997).

FERC sustained MoPSC's objections to the acquisition premiums embedded in the costs associated with MGC and MPC. However, the Commission initially declined to address MoPSC's challenge to the alleged acquisition premium embedded in the costs associated with the MIG pipeline. *See Mo. Interstate Gas, LLC*, 119 F.E.R.C. ¶ 61,074 (2007) ("*2007 Order*"). Later, upon denying a request for rehearing on this issue, *see Mo. Interstate Gas, LLC*, 122 F.E.R.C. ¶ 61,136 (2008) ("*2008 Order*"), FERC clarified its intention to allow MoGas's initial rates to stand, relying on an earlier order issued

in 2002 in which FERC allowed MIG to include the disputed costs in its own initial rates, *see Mo. Interstate Gas, LLC*, 100 F.E.R.C. ¶ 61,312 (2002) ("*2002 Order*").

In its petition for review before this court, MoPSC argues that FERC's decision regarding the inclusion of acquisition premium costs in MoGas's initial rates is arbitrary and capricious. We agree. FERC's action is plainly inconsistent with its own precedents. It is also inconsistent with the agency's treatment of the acquisition premiums embedded in the costs associated with MGC and MPC, with respect to which MoPSC's objections were sustained. FERC's claim that it properly deferred consideration of the disputed acquisition premium issue to an NGA § 4, 15 U.S.C. § 717c, proceeding is unavailing. MoPSC submitted evidence to FERC during the § 7 proceeding to demonstrate the existence of an improper acquisition premium and MoGas did not contest it or otherwise attempt to justify the alleged acquisition premium. "[B]oth the Supreme Court and this circuit have made clear that the Commission has a duty to use its § 7 power to protect consumers. . . . Indeed, the Commission's 'usual practice in Section 7 certificate proceedings' is to 'apply[], to the extent practicable, the same ratemaking policies that it applies in Section 4 rate cases.'" *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1070-71 (D.C. Cir. 2003) (quoting *Kan. Pipeline Co.*, 97 F.E.R.C. ¶ 61,168 at 61,785 (2001)); *see also Maritimes & Ne. Pipeline, LLC*, 84 F.E.R.C. ¶ 61,130 at 61,683 (1998). There is nothing in FERC's decision to suggest that it would have been impracticable to address the MIG acquisition premium issue in the § 7 proceeding, yet FERC failed to do so. Because the agency's decision is the antithesis of "reasoned decisonmaking," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 375 (1998), we grant the petition for review, vacate FERC's order with respect to the alleged acquisition premium issue regarding MIG, and remand the case for a prompt resolution of the question of the alleged acquisition premium.

## I. BACKGROUND

### A. *Statutory and Regulatory Background*

Under the NGA, 15 U.S.C. § 717 *et seq.*, FERC closely supervises the sale and transport of natural gas in interstate commerce. Under § 7 of the NGA, natural gas companies must obtain a certificate of public convenience and necessity from FERC before constructing, acquiring, or operating interstate natural gas pipelines. In the context of granting such a certificate, FERC sets initial rates governing the sale price of natural gas transported in the pipeline. Initial rates proposed by a new pipeline are approved if the agency finds that they are in the "'public interest.'" *See Mo. Pub. Serv. Comm'n*, 337 F.3d at 1068 (quoting *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 390-91 (1959)). "Initial rates 'offer a temporary mechanism to protect the public interest until the regular rate setting provisions' [of the NGA] . . . come into play." *Id.* (quoting *Algonquin Gas Transmission Co. v. Fed. Power Comm'n*, 534 F.2d 952, 956 (D.C. Cir. 1976)). These regular rate setting provisions are codified under § 4 and § 5 of the NGA. Section 4 allows pipelines to initiate proceedings to set or modify permanent rates, while § 5 allows FERC to do so on its own authority. Permanent rates established under § 4 and § 5 proceedings are governed by the "just and reasonable" standard. *See* 15 U.S.C. §§ 717c, 717d; *see also Mo. Pub. Serv. Comm'n*, 337 F.3d at 1068 (comparing "just and reasonable" and "public interest" standards).

### B. *Creation and Certification of MIG*

MIG was first created in 2002 pursuant to a plan to convert a decommissioned oil pipeline into an interstate natural gas pipeline. When MIG sought certification from FERC, MoPSC challenged the pipeline's proposed initial rates, arguing that they contained an improper acquisition premium. "Generally, when establishing the cost of service upon which a pipeline's

regulated rates are based, FERC employs 'original cost' principles" to determine what costs should be passed on to consumers. *Rio Grande Pipeline Co.*, 178 F.3d at 536. "Under these principles, when a facility is acquired by one regulated entity from another, the seller's depreciated original cost is included in the cost-of-service computations, even though the price paid by the purchaser may exceed that amount." *Id*. Any cost above the depreciated original cost (a term that is alternately referred to as the "net book value") is known as an acquisition premium. Under established FERC precedent, such premiums are disallowed, unless the agency applies its so-called "benefits exception" to this general rule. *See id*.; *Kan. Pipeline Co.*, 81 F.E.R.C. at ¶ 61,005. As the agency explained in its *Kansas Pipeline* case:

> The Commission has, with limited exception, considered amounts in excess of the net book value to be an acquisition premium that should be absorbed by the shareholders. The original cost policy is an old and accepted concept of public utility regulation. The Commission has allowed exceptions to this rule but, only when the purchaser has demonstrated specific dollar benefits resulting directly from the sale. However, the benefits must be tangible, non-speculative, and quantifiable in monetary terms. The burden of proof for a utility seeking to demonstrate specific dollar amounts is heavy.

*Id.* at 61,018 (footnotes omitted).

In 2002, when it approved MIG's proposed initial rates, *see 2002 Order*, 100 F.E.R.C. at 61,312, FERC noted that MIG "represent[ed] that the acquisition cost [reported by MIG for use in FERC's initial rate calculation was] the depreciated net book value of" the idled oil pipeline and its related assets as charged by the pipeline's seller, UtiliCorp United, Inc., *id.* at 62,396. After highlighting the fact that MoPSC had approved the sale of the decommissioned oil pipeline assets to MIG as an "arms-

length sale transaction between . . . non-affiliated parties" and the fact that "the facilities will be devoted to gas utility service for the first time," FERC declined to further evaluate whether MIG's initial rates should be reduced due to the alleged acquisition premium. *Id.* However, FERC directed MIG to file a cost and revenue study assuming the burden of proof on a number of issues, including the acquisition premium issue, related to the permanent rates that would govern MIG's operations going forward. *Id.* at 62,400. On March 17, 2006, after MIG submitted the required study, *see 2007 Order*, 119 F.E.R.C. at 61,474-75 (describing MIG's 2006 filing under FERC Docket No. RP06-274-000 ("2006 Docket Entry")), MoPSC filed a protest, contesting, among other things, the continuation of the alleged acquisition premium.

## C.  *Creation and Certification of MoGas*

In June 2006, before the contested issues relating to the 2006 Docket Entry could be resolved, MIG applied – along with two state-regulated intrastate pipelines, MGC and MPC – to reorganize into MoGas, a single, new federally regulated interstate natural gas company. MoPSC filed an opposition to MoGas's application in the § 7 proceeding, challenging MoGas's proposed initial rates on a number of grounds. MoPSC's objections included, *inter alia*, claims that MoGas's proposed initial rates included an improper acquisition premium carried over from the initial MIG rates established in 2002. MoPSC further claimed that the proposed initial rates also included improper acquisition premiums embedded in the costs associated with MGC and MPC.

In 2007, FERC approved initial rates for MoGas. *See 2007 Order*, 119 F.E.R.C. at 61,074. The agency sustained MoPSC's objections to the acquisition premiums embedded in the costs associated with MGC and MPC. In rejecting these acquisition premiums, FERC noted that, under the benefits exception, "the pipeline has the burden of establishing the dollar amount of the

benefits alleged to have been conferred upon the consumers," and that MoGas "provided no evidence in support of the benefits of the[se two] acquisition premium[s]." *Id.* at 61,467 (internal quotation marks omitted).

FERC, however, declined to direct MoGas to remove the alleged acquisition premium embedded in the costs associated with the MIG pipeline. The agency asserted that the issues regarding MIG which had been raised by MoPSC in the context of the 2006 Docket Entry were now "moot." *Id.* at 61,474. In other words, FERC noted that, with the issuance of a certificate to the merged entity, "Missouri Interstate will cease to exist as a separate interstate pipeline and will no longer charge separate rates." *Id.* Thus, the Commission saw no imperative to resolve the MIG acquisition premium issue pending in the 2006 Docket Entry in the context of MoGas's § 7 proceeding. FERC said nothing else regarding this issue in its *2007 Order*, though it did direct MoGas to file a § 4 rate case proceeding within 18 months to finalize its rates. *Id.* at 61,471-72.

On May 21, 2007, MoPSC filed a request for rehearing, asking FERC to reconsider several issues, including the alleged acquisition premium embedded in the MIG component of the new pipeline's initial rates. Request for Rehearing, or, in the Alternative, Clarification of the Missouri Public Service Commission (May 21, 2007), *reprinted in* Joint Appendix ("J.A.") 197-236. In its rehearing order of February 19, 2008, FERC granted rehearing with respect to certain issues but denied rehearing on the MIG acquisition premium issue. *See 2008 Order*, 122 F.E.R.C. at 61,136. The Commission contended that (1) addressing the issue would "turn this certificate proceeding into a rate proceeding" requiring more time-consuming procedures; (2) that MoPSC wanted FERC to "cherry pick one issue from [MIG]'s cost and revenue study and expend resources here to scrutinize" it; and (3) that initial rates are approved "based on estimates." *Id.* at 61,704. The agency

further relied on its *2002 Order*, which had addressed the inclusion of MIG's cost estimates in the initial rates for MIG. *Id.* MoPSC then petitioned this court for review, and also petitioned FERC for rehearing on the *2008 Order*. Because of the ongoing FERC filing, the appeal before this court was dismissed as premature. *Mo. Pub. Serv. Comm'n v. FERC*, No. 08-1160, slip op. at 1 (D.C. Cir. Sept. 10, 2008) (per curiam). On April 3, 2009, FERC issued an order denying rehearing of the *2008 Order*. *See Mo. Interstate Gas, LLC*, 127 F.E.R.C. ¶ 61,011 (2009) ("*2009 Order*"). The April 3 order did not address the acquisition premium issue. After issuance of the *2009 Order*, MoPSC timely petitioned this court again for review of the acquisition premium issue.

On appeal to this court, MoPSC raises a single issue: Whether FERC violated 5 U.S.C. § 706 or improperly denied due process to MoPSC when it included the alleged acquisition premium from MIG in the initial rates of the MoGas pipeline, deferring resolution of that issue to a future § 4 rate proceeding.

## II. ANALYSIS

### A. *Standard of Review*

Under the APA, agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" cannot survive judicial review. *See* 5 U.S.C. § 706(2)(A). FERC's orders are reviewed under this standard. *See Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010); *Rio Grande Pipeline Co.*, 178 F.3d at 541. FERC's action upholding the inclusion of an alleged acquisition premium in the initial rates of the MoGas pipeline, as well as its decision to defer the ultimate resolution of the acquisition premium's validity to a future § 4 rate proceeding, are both subject to arbitrary and capricious review pursuant to 5 U.S.C. § 706.

In a case such as this, the court's role is "'limited to assuring that the Commission's decisionmaking is reasoned, principled, and based on the record.'" *Rio Grande Pipeline Co.*, 178 F.3d at 541 (quoting *Pa. Office of Consumer Advocate v. FERC*, 131 F.3d 182, 185 (D.C. Cir. 1997)). This court has noted, however, that FERC must "'fully articulate the basis for its decision,'" and that a "'passing reference to relevant factors . . . is not sufficient to satisfy the Commission's obligation to carry out reasoned and principled decisionmaking.'" *Am. Gas Ass'n*, 593 F.3d at 19 (quoting *Mo. Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000) (internal quotation marks omitted)).

**B.** *Alleged MIG Acquisition Premium*

FERC's treatment of the MIG acquisition premium issue is arbitrary and capricious. The benefits exception to the rule disallowing acquisition premiums takes into account (1) whether the acquired facility is being put to a new use, *see Rio Grande Pipeline Co.*, 178 F.3d at 536; *Enbridge Energy Co., Inc.*, 110 F.E.R.C. ¶ 61,211 at 61,796 (2005); *Longhorn Partners Pipeline*, 73 F.E.R.C. ¶ 61,355 at 62,112-13 (1995); and (2) whether "the purchaser has demonstrated specific dollar benefits resulting directly from the sale." *Kan. Pipeline Co.*, 81 F.E.R.C. at 61,018; *see also Enbridge Energy Co., Inc.*, 110 F.E.R.C. at 61,796. FERC has also considered (3) whether the transaction at issue is an "arms length" sale between unaffiliated parties, *see, e.g.*, *Enbridge Energy Co., Inc.*, 110 F.E.R.C. at 61,796; and (4) whether the purchase price of the asset at issue is less than the cost of constructing a comparable facility, *see, e.g.*, *Rio Grande Pipeline Co.*, 178 F.3d at 536-37; *Enbridge Pipelines (Southern Lights) LLC*, F.E.R.C. ¶ 61,310 at 62,688 (2007). FERC has been clear that the pipeline carries the burden of proof of showing a benefits exception to justify the allowance of an acquisition premium. In order to meet this "heavy" burden, a pipeline must prove the existence of benefits to consumers that

are "tangible, non-speculative, and quantifiable in monetary terms." *Kan. Pipeline Co.*, 81 F.E.R.C. at 61,018.

There is no question that FERC did not apply the "specific dollar benefits" requirement in allowing the alleged acquisition premium from MIG to be included in the initial rates of the MoGas pipeline. Indeed, FERC did not directly evaluate the MIG premium according to any of the elements of the benefits exception test. Instead, the agency relied on its *2002 Order*, which noted (1) MIG's original assertion that its costs reflected net book value; (2) that the assets, which had been used as an oil pipeline, would be converted to gas utility service for the first time; and (3) that MoPSC had approved the underlying sales transaction "as an arms-length sale . . . between non-affiliated parties." *2002 Order*, 100 F.E.R.C. at 62,396. Reliance on the *2002 Order* is entirely inadequate to justify the Commission's action in this case.

First, as noted below, MoPSC submitted uncontested evidence showing that the assertions made by the pipeline in the proceedings leading to the *2002 Order* were suspect. This evidence included reference to testimony from the then-president of both MPC and MGC that the piece of pipeline that ultimately became MIG contained an acquisition premium. Second, FERC's analysis in this case unequivocally does not include any assessment of "tangible, non-speculative, and quantifiable" benefits to consumers. *Kan. Pipeline Co.*, 81 F.E.R.C. at 61,018. And, finally, MoGas offered nothing to meet its burden of justifying any acquisition premium carried over from the initial MIG rates. Indeed, during arguments before this court, FERC's counsel forthrightly acknowledged that the Commission never determined that MoGas had met its burden of establishing the dollar amount of benefits alleged to have been conferred upon the consumers, as required by the benefits exception test.

It is also highly noteworthy that FERC explicitly conducted a benefits exception inquiry with respect to the acquisition premiums embedded in the costs associated with MGC and MPC. The Commission rejected the inclusion of those premiums because MoGas "provided no evidence in support of the benefits" of the premiums. *2007 Order*, 119 F.E.R.C. at 61,467.

Apparently recognizing the frailty of its position, FERC argues in the alternative that, even if it did not apply the benefits exception test as articulated in *Kansas Pipeline*, it did no less than is required in a § 7 proceeding. Relatedly, FERC claims that it can defer a more detailed evaluation of the alleged acquisition premium to a § 4 rate proceeding. We reject these claims.

It is true that the public interest standard governing the establishment of initial rates in § 7 proceedings is not coterminous with the just and reasonable standard governing the establishment of permanent rates in a § 4 proceeding. *See*, *e.g.*, *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1070 (describing the public interest standard as "less exacting"); *2007 Order*, 119 F.E.R.C. at 61,472 (describing the public interest standard as "somewhat more lenient"). FERC fails, however, to provide a reasoned explanation for why the existence of and justification for the alleged acquisition premium here could not be evaluated in the § 7 proceeding in this case.

As noted at the outset of this opinion, "both the Supreme Court and this circuit have made clear that the Commission has a duty to use its § 7 power to protect consumers. . . . Indeed, the Commission's 'usual practice in Section 7 certificate proceedings' is to 'apply[], to the extent practicable, the same ratemaking policies that it applies in Section 4 rate cases.'" *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1070-71 (quoting *Kan. Pipeline Co.*, 97 F.E.R.C. at 61,785); *see also Maritimes & Ne. Pipeline, LLC*, 84 F.E.R.C. at 61,683. There is nothing in FERC's

decision to suggest that it would have been impracticable to address the MIG acquisition premium issue in the § 7 proceeding. The *2007 Order* did not address the MIG acquisition premium issue at all. Rather, the Commission simply dismissed as "moot" any open issues from the 2006 Docket Entry due to the dissolution of MIG. *2007 Order*, 119 F.E.R.C. at 61,474. But of course the acquisition premium issue was not moot, as evidenced by FERC's rejection of the acquisition premiums embedded in the costs associated with MGC and MPC.

In its *2008 Order*, the Commission refused to address the acquisition premium issue on the ground that § 7 proceedings involve initial rates "approved . . . based on estimates" of how pipelines will operate. *2008 Order*, 122 F.E.R.C. at 61,704. FERC has noted in other cases that, because a pipeline has no operating history at the time when it applies for its initial certificate, initial rates are often "based only on estimates of what an appropriate rate for each service should be." *Maritimes & Ne. Pipeline, LLC*, 81 F.E.R.C. ¶ 61,166 at 61,726 (1997). Therefore, it is sometimes better to defer final judgment on certain rate issues until a § 4 proceeding when "the pipeline has an operating history." *Id.* But this rationale lends no support to FERC's refusal in this case to scrutinize the alleged acquisition premium carried over from MIG. The threshold question of whether or not an acquisition premium exists, for example, appears to be a straightforward accounting question. In any event, at least in this case, it seems clear that FERC easily could have resolved the threshold issue on the basis of the uncontested paper record before it in the § 7 proceeding. Indeed, FERC never explains why it could not make such a determination based wholly on the operational data from MIG's cost and revenue study submitted as part of the 2006 Docket Entry.

Furthermore, neither FERC nor MoGas suggest that establishing the dollar amount of benefits – the key prong of the

"benefits exception" test that was ignored by FERC in this case – requires prospective data on pipeline operating history in all cases. In *Kansas Pipeline*, for example, FERC disallowed an acquisition premium in a § 7 proceeding. *Kan. Pipeline Co.*, 81 F.E.R.C. at 61,018. The Commission's decision makes no reference to any distinction between § 4 and § 7 proceedings in this regard; nor do the cases it cites make any such distinction. *Kansas Pipeline* is also consistent with FERC's treatment of the acquisition premiums associated with MPC and MGC in this very case, whose inclusion in MoGas's initial rates was rejected because of a lack of evidence supporting tangible dollar benefits. *2007 Order*, 119 F.E.R.C. at 61,467. FERC's decision in this case offers no meaningful distinction between the MIG acquisition premium, on the one hand, and the *Kansas Pipeline*, MPC, and MGC acquisition premiums, on the other.

In its *2008 Order*, FERC claims that if MoPSC's challenge were addressed in the § 7 proceeding, this "potentially would have involved procedures associated with trial-type hearings" and would "turn th[e] certificate proceeding into a rate proceeding." *2008 Order*, 122 F.E.R.C. at 61,704. On the record of this case, this is an unpersuasive claim. MoPSC submitted *undisputed* evidence to FERC demonstrating the existence of an allegedly improper acquisition premium related to MIG. This evidence included both financial data, *see* UtiliCorp Pipeline Systems, Inc. Estimated Purchase Price Certificate at 3 (2002), J.A. 250, and 2001 testimony from the then-president of both MPC and MGC that the piece of pipeline that ultimately became MIG contained an acquisition premium, Missouri Public Service Commission Tr. of Hearing (Sept. 5, 2001), at 121-23, J.A. 244-46. This evidence was properly before FERC in the § 7 proceeding, *and the evidence was not contested by the pipeline*. Given this record, the Commission's vague suggestion that it would be inefficient "to cherry pick" this "one issue" from the cost and revenue study is hardly persuasive. *2008 Order*, 122 F.E.R.C. at 61,704.

Finally, FERC notes that on June 30, 2009, MoGas filed a § 4 rate case to establish permanent rates and points out that the § 4 proceeding will resolve the acquisition premium issue going forward. However, the § 4 proceeding will simply set just and reasonable rates prospectively. It will not address the validity of the initial rates approved in the § 7 proceeding that are at issue in this case.

### III. CONCLUSION

We hereby grant the petition for review and vacate FERC's order with respect to the alleged acquisition premium issue. The case is remanded to the Commission for a prompt resolution of the question of the alleged acquisition premium.