# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 12, 2014          Decided April 7, 2015

No. 13-1278

MISSOURI PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MOGAS PIPELINE LLC,
INTERVENOR

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Lera Shemwell* argued the cause for petitioner. With her on the briefs was *Stephen C. Pearson*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Paul Korman* argued the cause for intervenor. With him on the brief were *Amy W. Beizer* and *Emily R. Pitlick*.

Before: GARLAND, *Chief Judge*, and ROGERS and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* Rogers.

Concurring opinion by *Circuit Judge* Millett.

ROGERS, *Circuit Judge*:  This petition follows our remand for application of the "benefits exception" to the general policy of the Federal Energy Regulatory Commission against including an acquisition premium in a pipeline's rate base. *Missouri Pub. Serv. Comm'n v. FERC ("Missouri I")*, 601 F.3d 581, 588 (D.C. Cir. 2010).  The Commission describes its benefits exception as allowing an acquisition premium to be included in a pipeline's rate base when the purchase price is less than the cost of constructing comparable facilities, the facility is converted to a new use, and the transacting parties are unaffiliated.  *See Missouri Interstate Gas, LLC ("Remand Order")*, 142 F.E.R.C. ¶ 61,195, at ¶ 113 (2013).   That is consistent with the Commission's precedent, *see Longhorn Partners Pipeline*, 73 F.E.R.C. ¶ 61,355, at 62,112 (1995), and with our own characterization of that precedent, *see Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 536–37 (D.C. Cir. 1999).  Although petitioners would distinguish past decisions on their facts, the court defers to the Commission's interpretation of its own precedents in the challenged orders.  To the extent petitioner raises a question whether the pipeline project benefits Missouri customers in the first place, the Commission permissibly relied on its 2002 Order certificating the Missouri Interstate Gas facilities for interstate use.  Accordingly, we deny the petition for review.

## I.

At issue is the acquisition premium associated with the

Trans-Mississippi Pipeline ("TMP"), a 5.6-mile stretch of pipeline that connects Missouri with Illinois beneath the Mississippi River.  In 2002, pursuant to section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f, the Commission issued Missouri Interstate Gas, LLC (which later merged to become MoGas Pipeline, LLC ("MoGas")) a certificate of public convenience and necessity to undertake a project that included using the TMP for natural gas service for the first time.  The Commission found it was in the public interest because the project would "provide Missouri customers the opportunity to diversify their gas supply options with the installation of minor pipeline facilities and a minimal impact to the environment," *Missouri Interstate Gas, LLC ("2002 Order")*, 100 F.E.R.C. ¶ 61,312, at ¶ 2 (2002), and that in turn would improve reliability and supply diversity and increase competition, *see id.* ¶¶ 15, 17–18.  On remand from this court in *Missouri I*, the Commission approved inclusion of the acquisition cost in MoGas's rate base because the TMP had been devoted to a new use, transporting natural gas instead of oil, and the cost of new construction would have been greater, *see Remand Order* ¶¶ 95, 110, and denied rehearing, *Missouri Interstate Gas, LLC ("Rehearing Order")*, 144 F.E.R.C. ¶ 61,220 (2013).

Petitioner does not challenge the Commission's factual findings on remand or its determination that the TMP was converted to a new use.  Instead, petitioner challenges the Commission's determination that the pipeline company had shown that the acquisition of pipeline facilities provided specific benefits in accordance with Commission precedent.  Although acknowledging that a lower acquisition cost can produce benefits to customers in some cases, petitioner contends the Commission failed to adhere to its precedent and to examine whether there were actual quantifiable dollar benefits for Missouri customers.

**A.**

NGA § 7 requires that the Commission must issue a certificate of public convenience and necessity before a new interstate pipeline may begin to operate. *See* 15 U.S.C. § 717f(c)(1)(A); *Missouri I*, 601 F.3d at 583. A certificate may issue only if "the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). When the Commission issues a certificate of public convenience and necessity, it "sets initial rates governing the sale price of natural gas transported in the pipeline," *Missouri I*, 601 F.3d at 583, and may "attach to the . . . certificate . . . such reasonable terms and conditions as the public convenience and necessity may require," 15 U.S.C. § 717f(e). Under that authority, the Commission "employs a 'public interest' standard to determine the initial rates that a pipeline may charge for newly certificated service." *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1068 (D.C. Cir. 2003) (citing *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959)). Initial rates "offer a temporary mechanism to protect the public interest until" the Commission sets permanent rates pursuant to NGA § 4, 15 U.S.C. § 717c. *Algonquin Gas Transmission Co. v. Fed. Power Comm'n*, 534 F.2d 952, 956 (D.C. Cir. 1976).

"Generally, when establishing the cost of service upon which a pipeline's regulated rates are based, [the Commission] employs 'original cost' principles," and "when a facility is acquired by one regulated entity from another, [only] the seller's depreciated original cost is included in the cost-of-service computations, even though the price paid by the purchaser may exceed that amount." *Rio Grande*, 178 F.3d at 536 (citing *N. Natural Gas Co.*, 35 F.E.R.C. ¶ 61,114, at 61,236 (1986)). The cost above that amount (i.e., net-book value) is known as an acquisition adjustment or premium and is disallowed, unless the

"benefits exception" applies. The general policy, as described by the Federal Power Commission, was designed to prevent facilities from being sold at artificially inflated prices in order to increase rates, *see United Gas Pipe Line Co.*, 25 F.P.C. 26, at 64 (1961), and since then has been described as designed to protect customers from paying twice for depreciation, *see, e.g., Cities Serv. Gas Co.*, 4 F.E.R.C. ¶ 61,268, at 61,596 (1978).

The Commission has established a two-part benefits exception test, whereby a pipeline facility that has been converted from one public use to another or placed in jurisdictional service for the first time may include an acquisition premium in its rate base if the pipeline can show by clear and convincing evidence that its acquisition of the facilities will provide "substantial, quantifiable benefits to ratepayers." *Longhorn*, 73 F.E.R.C. at 62,112. One way these benefits can be shown is by demonstrating that the proposed conversion would "result in utilization of a currently-underutilized facility, which could not be replicated for the price that [the pipeline was] willing to pay." *Id*. at 62,113. The new-use requirement is consistent with the Commission's general policy of exclusion of acquisition premiums because customers will not be burdened twice for the cost of depreciating facilities. *See Cities*, 4 F.E.R.C. at 61,596; *see also Longhorn*, 73 F.E.R.C. at 62,113; *Natural Gas Pipeline Co. of Am.*, 29 F.E.R.C. ¶ 61,073, at 61,150 (1984).

**B.**

The background to the instant petition is set forth in *Missouri I*, 601 F.3d at 583–85. On remand from this court, an administrative law judge ("ALJ") ruled, after an evidentiary hearing, that the TMP's acquisition cost could not be included in MoGas's rate base. Although finding the pipeline's net-book value was zero and thus the entire $10,088,925 purchase price constituted an acquisition premium, and the pipeline was being

put to a new use, transporting natural gas rather than oil, the ALJ concluded that the second prong of the benefits exception test was not satisfied because the pipeline had "not met its burden to prove that the cost to construct the TMP is considerably higher than the pipeline's purchase price." *Missouri Interstate Gas, LLC ("ALJ Remand")*, 137 F.E.R.C. ¶ 63,014, at ¶ 320 (2011).

The Commission reversed in part, finding the first prong of the benefits exception test had not been challenged and that the ALJ erred in concluding that the second prong was not satisfied, because "the record demonstrates that the acquisition of these facilities at more than their net book value results in substantial benefits to ratepayers." *Remand Order* ¶ 2. The ALJ erred in requiring the difference between purchase price and construction cost to be "exorbitant," *ALJ Remand* ¶ 313, the Commission explained, because nothing in *Crossroads*, 71 F.E.R.C. ¶ 61,076, on which the ALJ relied, supported such a prerequisite and instead only required that the benefits must be "commensurate with the acquisition costs that exceed the depreciated original costs." *Remand Order* ¶ 111 (quoting *Crossroads*, 71 F.E.R.C. at 61,262) (internal quotation marks omitted). The ALJ's reliance on *KN Wattenberg Transmission Limited Liability Co.*, 85 F.E.R.C. ¶ 61,204 (1998), was also misplaced because that decision relied upon factors not present here, namely that the buyer and seller were affiliates and ratepayers had already paid for depreciation of the facility. *Remand Order* ¶ 112.

To clarify, the Commission stated: "In conversion cases involving non-affiliates, the Commission has consistently allowed the full purchase price in [a] rate base when the record supports a finding that the purchase price is less than the cost to construct comparable facilities." *Id.* ¶ 113. It cited its decisions in *Crossroads*, 71 F.E.R.C. at 61,262–63; *Natural*, 29 F.E.R.C. at 61,150; and *Cities*, 4 F.E.R.C. at 61,596. The Commission elaborated on its rationale: "Allowing the full purchase price . . .

in rate base in these circumstances provides specific benefits to . . . ratepayers because the approved recourse rates will be no higher, if not somewhat lower, than if the pipeline built new facilities." *Remand Order* ¶ 113. Further, the Commission noted, "[t]his ruling also provides jurisdictional companies appropriate incentives to purchase and utilize existing facilities in lieu of constructing new facilities, thereby avoiding unnecessary construction and the attendant environmental impacts." *Id.* Having found that the second prong of the benefits exception test was satisfied, the Commission stated it had no need to consider additional specific dollar benefits identified by MoGas once the TMP offered service, such as "demand charge credits to shippers, access to flexible point rights, and lower initial rates." *Id.* ¶ 114.

On rehearing, the Commission again rejected arguments that its benefits exception "requires a finding of specific benefits in addition to a finding that the costs of acquiring the existing pipeline is less than cost of constructing comparable facilities" and that it "can only make a finding of specific benefits if the pipeline's rate proposal is supported, or at least not opposed, by customers." *See Rehearing Order* ¶¶ 48, 50. The Commission found no support for this requirement in *Cities*, *Natural*, or *Crossroads*, and, in light of its own precedent, did not interpret the description of the benefits exception in *Missouri I*, 601 F.3d at 586, to require separate findings of both "'specific dollar benefits resulting directly from the sale'" and a purchase price lower than the cost of new construction. *Rehearing Order* ¶ 48 (quoting *Missouri I*, 601 F.3d at 586). Furthermore, the Commission noted that because the decision to issue a certificate of public convenience and necessity to place the TMP facilities into interstate service "already addressed the initial question as to whether there are benefits to including the cost of the TMP facilities in initial rates," on remand it "appropriately applied the *Longhorn* test to determine the exact level of costs of the TMP

facilities to include in rates by evaluating whether it would cost more to construct new comparable facilities." *Id.* ¶ 49. Additionally, in view of its "independent obligation under [NGA § 7, 15 U.S.C. § 717f(e)] to ensure that initial rates are in the public interest," *id.* ¶ 50, the Commission explained that "[p]ermitting a single customer the right to veto the inclusion of an acquisition . . . premium in rates, regardless of the pipeline's showing of specific benefits, is at odds with this statutory requirement." *Id.* So, disregarding the testimony of Ameren, a MoGas customer, challenging MoGas's claims of additional specific dollar benefits was not inappropriate because the difference in acquisition and construction costs satisfied the second prong of the benefits exception test and there was no need to consider other possible benefits. *See id.* ¶ 54.

The Commission further concluded that the attempt to distinguish its precedents on other grounds was unpersuasive for the following reasons: The fact that there were existing customers on the merged pipeline, unlike in *Crossroads*, did not make inapposite its decision in *Crossroads* that specific benefits had been shown because the Commission had addressed customers' subsidization concerns in designing MoGas's initial rates. *Id.* ¶ 51. Likewise, it was a misreading of *Natural* to suggest the pipeline proposed to provide service on newly acquired facilities for free; in that case, "the costs of the facilities, including the acquisition adjustment, were borne by the new shippers" taking service. *Id.* ¶ 52. So too, *United Gas* and *Kansas Pipeline* were not at odds with the Commission's decision on the TMP acquisition premium because the denials of rate base treatment for acquisition adjustments in those cases were based on different records. *See id.* ¶ 53. In *Kansas Pipeline Co.*, 81 F.E.R.C. ¶ 61,005 (1997), the State's inclusion of the acquisition premiums in *state-regulated* rates was insufficient to demonstrate specific dollar benefits resulting from the sale. In *United Gas*, "there was no showing that any

rate reductions had any relationship to the payment of amounts in excess of the original cost." *Rehearing Order* ¶ 53. By contrast, the Commission observed, MoGas had demonstrated specific dollar benefits because the purchase price of the TMP facilities was less than the cost of constructing comparable facilities. *See id.* It further observed, upon acknowledging its statement in *Enbridge Pipelines (KPC)*, 109 F.E.R.C. ¶ 61,042 (2004), that proving substantial benefits under *Longhorn* is a heavy burden, that case did not involve a pipeline converted to a new use and that its precedents such as *Cities*, *Natural*, and *Crossroads* showed that its strong policy against inclusion of acquisition adjustments in rate base "'is not inflexible.'" *Rehearing Order* ¶ 57 (quoting *Cities*, 4 F.E.R.C. at 61,596).

## II.

Petitioner challenges the *Remand* and *Rehearing Orders* on two grounds. First, it contends that, under Commission precedent, "whether the purchaser has demonstrated specific dollar benefits resulting directly from the sale" cannot be satisfied simply by demonstrating that "the purchase price of the asset at issue is less than the cost of constructing a comparable facility." Petr.'s Br. 18 (internal quotation marks omitted). Second, it contends the Commission was required to examine whether there were actual benefits to consumers beyond the lower purchase price and it failed to do so, in part by failing to address whether consumers opposed the acquisition.

The court reviews the Commission's decisions under the deferential arbitrary and capricious standard of the Administrative Procedure Act, and its role "is limited to assuring that the Commission's decisionmaking is reasoned, principled, and based upon the record." *Rio Grande*, 178 F.3d at 541 (internal quotation marks omitted). When ratemaking is involved, the court is "particularly deferential to the

Commission's expertise." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (internal quotation marks omitted). Further, deference is due to the Commission's interpretation of its own precedent. *See Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 743 (D.C. Cir. 2007). The court, however, "must reverse a decision that departs from established precedent without a reasoned explanation." *Exxon Mobil Corp. v. FERC*, 315 F.3d 306, 309 (D.C. Cir. 2003) (citing *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995)). We find no basis to do so here.

## A.

Commission precedent amply supports the challenged orders. The precedent cited by the Commission allows inclusion of an acquisition premium in a pipeline's rate base under the benefits exception where there has been arms-length bargaining so long as there is a new use and the cost of acquisition is less than the cost of construction. Following an evidentiary hearing on remand, the Commission found that applying the benefits exception to the TMP project ensured that "the approved recourse rates will be no higher, if not somewhat lower, than if the pipeline built new facilities." *Remand Order* ¶ 113. This was because the acquisition cost was $1.4 million less than new construction. *Id.* Counsel for the Commission noted that if there is a finding that the public convenience and necessity *requires* that a new pipeline is being put into service one way or another, then the question is whether it will come into existence through new-use acquisition or new construction, and whichever course of action is selected, the cost will be passed along to ratepayers. *See* Oral Arg. Rec. 40:18-40:22; 21:50-22:36 (Dec. 12, 2014). The choice of a lesser acquisition cost benefits consumers, *cf. Enbridge Energy Co., Inc.*, 110 F.E.R.C. ¶ 61,211, at 61,796 (2005), and the cost difference with new construction costs quantifies the benefits.

In *Cities*, 4 F.E.R.C. ¶ 61,268, the Commission had determined that "the public convenience and necessity requires Cities Service's pipeline," *id.* at 61,595, and permitted inclusion of the full purchase price of a new pipeline in the rate base, *id.* at 61,596, explaining that although it "generally has a strong policy against" including acquisition premiums in rate base, "that policy is not inflexible," *id.* "Where the transfer at a price above book value benefits consumers, it is sometimes appropriate to permit the entire purchase price to go into the rate base." *Id.* There, the depreciated book value was approximately $3 million, while the purchase price was $18.5 million, and construction of a new pipeline would have cost over $40 million. *Id.* The Commission noted that it was "also significant that the pipeline ha[d] not been devoted to gas utility service" and thus "gas consumers w[ould] not be burdened twice for the costs of depreciating the facilities." *Id.* The Commission's analysis was limited to those two factors: new use and a purchase price less than the cost of new construction.

A differential similar to that in the instant case sufficed in *Natural*, 29 F.E.R.C. ¶ 61,073, where the acquisition cost was $1 million lower than new construction costs. The Commission had found in *Natural* the pipeline would be in the public interest and thereafter allowed the acquisition premium attributable to the interstate portion of the new pipeline — $20 million, which was greater than the $6 million depreciated original cost, but less than the $21 million estimated cost of constructing a comparable pipeline — to be included in the rate base. *Id.* at 61,150. The Commission noted that costs associated with the purchased pipeline would be borne only by customers who chose to use the new segment. It further explained that "gas customers would not be burdened twice for the cost of depreciating the facilities since the facilities had not previously been devoted to gas utility service." *Id.* (citing *Cities*, 4 F.E.R.C. ¶ 61,268).

In *Crossroads*, 71 F.E.R.C. ¶ 61,076, too, the Commission had found the pipeline, which was being put to a new use by providing natural gas in Indiana and Ohio instead of oil, was "required by the public convenience and necessity," *id.* at 61,261, and so allowed the $16 million acquisition cost to be included in the initial rate base of the pipeline. The $16 million acquisition cost and associated costs of $6.4 million for conversion and extension were "considerably less than the costs associated with constructing a new 201-mile, 20-inch diameter pipeline." *Id.* at 61,262. Hence, the Commission determined that "ratepayers will receive commensurate benefits from the acquisition of the oil pipeline." *Id.*

Other precedent cited by the Commission on brief is to the same effect, indicating that the cost differential itself provides a commensurate benefit that is sufficient to satisfy the second prong of the benefits exception test. For example, in *Longhorn*, the Commission had concluded that the second prong of the test was met because "[t]he conversion will result in utilization of a currently-underutilized facility, which could not be replicated for the price that [the buyer] is willing to pay." 73 F.E.R.C. at 62,113. As it also noted in *Cities* and *Natural*, the Commission observed that "shippers who have paid for the crude oil line . . . are quite different from those shippers who would be charged for the use of the converted [natural gas] line." *Id.* Likewise, in *KN Interstate Gas Transmission Co.*, 79 F.E.R.C. ¶ 61,268, at 62,151 (1997), the Commission explained the second prong of the benefits exception test required only that "rate payers will realize benefits commensurate with the acquisition costs that exceed the depreciated original costs." There, the "estimated cost of $159.2 million to complete the . . . project [wa]s considerably below the estimated $320 million cost to construct a comparable new pipeline." *Id.*

To the extent petitioner attempts to distinguish the cases

cited by the Commission in the challenged orders on the grounds that the pipelines' rates in *Crossroads*, *Cities*, and *Natural* were either negotiated or unopposed, or both, and so there *must have been* benefits for customers, *see* Petr.'s Br. 33–38, the Commission responded, correctly: "There is no language in the Commission orders in [those decisions] that suggests that customer support or a lack of customer opposition was an essential factor in the Commission's findings in those proceedings," *Rehearing Order* ¶ 50. The Commission pointed out that relying on non-opposition, as petitioner suggested, would have been "at odds with" its "independent obligation . . . to ensure that initial rates are in the public interest." *Id.*; *see also Mo. Pub. Serv. Comm'n*, 337 F.3d at 1076. Moreover, evidence of Missouri customer opposition was considered in the *2002 Order*, and, the Commission noted, that order was never challenged. *Rehearing Order* ¶¶ 49, 54.

Petitioner's reliance on *United Gas*, 25 F.P.C. 26, as requiring that a pipeline must show benefits to consumers beyond a construction-acquisition cost differential, is misplaced. In observing that acquisition costs "may or they may not be includible in the rate base, depending on whether it can be established . . . that consumer benefits flowed to the rate payers to the extent of the" premium, 25 F.P.C. at 50, the Federal Power Commission referred to rate reductions as one example of such benefits. Building on *United Gas*, Commission precedent has since explained why the requisite showing of customer benefits can be satisfied with evidence of an acquisition cost being lower than that of new construction. *See, e.g.*, *Longhorn*, 73 F.E.R.C. at 62,112–13. As discussed, because the ratepayers for a project that has received a certificate of public convenience and necessity will pay rates based on the rate base associated either with the costs of acquisition or costs of new construction, acquiring a pipeline segment at a price cheaper than the cost of constructing a

comparable alternative can reasonably be expected to lead to benefits in the form of rate reductions. Other Commission decisions describing the benefits exception that are relied on by petitioner indicate no change in the Commission's approach. *See, e.g., Enbridge Pipelines (Southern Lights) LLC*, 121 F.E.R.C. ¶ 61,310 (2007); *Enbridge Energy*, 110 F.E.R.C. ¶ 61,211; *Questar S. Trails Pipeline Co.*, 89 F.E.R.C. ¶ 61,050 (1999).

Petitioner maintains, however, that there are instances where the Commission has identified benefits beyond a cost differential (e.g., offering access to a new or under-utilized supply), or highlighted factual circumstances not present in the instant case (such as a pipeline's reliance on a negotiated rate instead of a cost of service rate), or relied upon benefits that the Commission did not mention. *See* Petr.'s Br. 21, 25–31. As to types of benefits, the court in *Missouri I*, 601 F.3d at 586, listed four elements it found in Commission decisions. Quoting *Kansas Pipeline* for the proposition that one factor is "whether 'the purchaser has demonstrated specific dollar benefits resulting directly from the sale,'" *Missouri I*, 601 F.3d at 586 (quoting *Kansas Pipeline*, 81 F.E.R.C. at 61,018), the court characterized this as the "key" element, *id*. at 588. In petitioner's view, the challenged orders are inconsistent with the court's statement of the test. But nothing the court said purported to change the test adopted by the Commission. The issue before the court in *Missouri I* was whether the Commission improperly included the alleged acquisition premium in MoGas's initial rates while deferring resolution of the issue to a future NGA § 4 rate proceeding. *See id.* at 585. Concluding that it had, the court noted that the Commission "did not directly evaluate the . . . premium according to *any* of the elements of the benefits exception test," *id.* at 586 (emphasis added), vacated the Commission's order with respect to the alleged acquisitions premium issue, and remanded that issue to

the Commission for resolution, *see id.* at 588. The court thus had no occasion to consider the evidentiary content of the second prong of the *Longhorn* test. Previously, in *Rio Grande*, 178 F.3d at 542, where the Commission had adopted a *per se* prohibition when the seller acquires an equity position in the purchaser that the court concluded was unsupportable, the court noted because it was clear Rio Grande had put the pipeline to a new use, *see id.*, a remand was called for to allow the Commission to address the second prong, *see id.* at 543; nothing in *Missouri I* purported to question that understanding of the Commission's test.

The Commission's analysis of its precedent in the challenged orders, to which we defer, refutes petitioner's suggestion that the Commission has departed from the *Longhorn* test and the determination that evidence of a difference between acquisition and construction costs generally may suffice to satisfy the second prong of the test. Other Commission decisions relied upon by petitioner to show the Commission has departed from its precedent are inapposite. For instance, in *Enbridge Pipelines (KPC)*, 102 F.E.R.C. ¶ 61,310, at 62,022–23 (2003), and *KN Wattenberg*, 85 F.E.R.C. at 61,853–54, no new pipeline use was involved. *See Remand Order* ¶ 112.

**B.**

Petitioner also contends that a cost differential cannot suffice under the second prong of the benefits exception test absent a determination that the consumers being served will actually benefit. *See* Petr.'s Br. 38. Even assuming, as petitioner maintains, that the Commission was required to identify benefits for consumers from the TMP project other than a cost of acquisition lower than the hypothetical cost of construction, the Commission did so, appropriately relying in part on benefits that it had identified in 2002 when it certified the TMP project pursuant to NGA § 7.

Again, the clearest benefit resulting from the lower acquisition cost of the TMP project is the likelihood that it will lower costs passed along to ratepayers in using a pipeline whose construction the Commission determined was required by the public convenience and necessity. *See Remand Order* ¶ 113. In addition, the Commission noted its findings in the *2002 Order* that the TMP project would benefit customers by promoting reliability through providing new sources of supply and fostering competition. *See Rehearing Order* ¶ 49 & n.86. For instance, the Commission found that certain parts of Missouri had limited access to certain supply areas and the TMP project would increase competition and offer new sources of gas supply and transportation to Missouri consumers served by the interstate pipeline that would interconnect with the TMP. *See id.* (citing *2002 Order* ¶ 18). Contrary to the implication of petitioner's argument, then, this is not a case in which the Commission certified the TMP project based principally on out-of-state benefits and approved an acquisition premium in the pipeline's rate base to be paid by non-beneficiary in-state ratepayers; the court consequently has no occasion to consider how a petition in those circumstances would be resolved.

Petitioner's critique that the benefits exception test lacks teeth because "the estimate [of construction cost] is a hypothetical alternative" that "will never be put to the test," Petr.'s Br. 52, is belied by the record. Petitioner challenged the hypothetical construction cost, prompting the ALJ to reduce it by $2.4 million, *see ALJ Remand* ¶ 314; *Remand Order* ¶ 110; *Rehearing Order* ¶ 55. Intervenor notes, moreover, that petitioner also had the opportunity to present other challenges to the pipeline's evidence, such as cross-examining MoGas's expert, but did not. *See* Intervenor MoGas Pipeline LLC Br. 28–29.

Finally, in its reply brief petitioner suggests that when

determining whether an acquisition premium can be included in a pipeline's rate base, the Commission ought not be permitted to rely on the findings made when certifying the project pursuant to NGA § 7, lest the two questions collapse into one. *See* Reply Br. 18–19. Even assuming this argument is properly before the court, *see Holland v. Bibeau Const. Co.*, 774 F.3d 8, 14 (D.C. Cir. 2014), nothing in this court's remand order in *Missouri I* so limited the Commission, and the record in the instant case shows that the fact some benefits may be analogous does not render the two determinations legally indistinguishable. Of course, insofar as petitioner seeks to suggest there was no benefit to Missouri consumers from the TMP project in the first place, that challenge would be an impermissible collateral attack on the *2002 Order*. *See Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 824–25 (D.C. Cir. 2008).

Accordingly, we deny the petition for review.

MILLETT, *Circuit Judge*, concurring: In my view, the Commission's decision barely ekes past our deferential review. The near-fatal flaw is that the Commission persists in a bafflegab articulation of its rule for including acquisition premiums in rates. On the one hand, the Commission has said repeatedly that the prohibition on the inclusion of acquisition premiums in rates is broad and emphatic, with the benefits exception being narrow and sparingly applied. To walk that narrow path, a pipeline must "show[] by clear and convincing evidence that the acquisition results in substantial benefits to ratepayers." *Longhorn Partners Pipeline*, 82 FERC ¶ 61,146, 61,542 (1998); *see also, e.g.*, *Public Service Co. of New Mexico*, 142 FERC ¶ 61,168 P 25 (2013) (requiring "tangible and nonspeculative" "specific dollar benefits" that "are clearly related [to] and solely the result of the acquisitions") (internal quotation marks omitted); *Missouri Pub. Service Comm'n v. FERC*, 601 F.3d 581, 586 (D.C. Cir. 2010) ("'heavy' burden" to show "benefits to consumers that are 'tangible, non-speculative, and quantifiable in monetary terms'") (quoting *Kansas Pipeline Co.*, 81 FERC ¶ 61,005, 61,018 (1997)).

On the other hand, aspects of the Commission's decision in this and some past cases seem to welcome automatically the inclusion of acquisition premiums in rates any time the pipeline shows that "(1) the acquired facility is being put to new use, and (2) the purchase price is less than the cost of constructing a comparable facility." *Enbridge Pipelines (S. Lights) LLC*, 121 FERC ¶ 61,310 P 38 (2007) (quoting *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 536-537 (D.C. Cir. 1999)). Beyond any findings underlying a certificate of public convenience and necessity, the Commission seems to indicate that no showing of actual desire or demand *by customers* for the refurbished service need be made, or even that a *new* pipeline would actually have been built.

Whither that prior insistence on clear and convincing evidence of actual, substantial and direct benefits to ratepayers?

Here the Commission says the benefit is that the rates "will be no higher, if not somewhat lower, than if the pipeline built new facilities." *Missouri Interstate Gas, LLC* ("*Remand Order*"), 142 FERC ¶ 61,195 P 113 (2013). That is not the same as an actual, substantial benefit at all. And if that articulation actually captured the Commission's position, what began as a clear requirement that a substantial affirmative benefit be shown would have transmogrified into a "no harm, no foul" rule, without an explanatory word being uttered by the Commission.

Also seemingly overlooked by the Commission is the simple proposition that cheaper is not always better. In this case, the ratepayers got a refurbished, 50-year-old pipeline paired with the feeble assurance that the cost to them will be "no higher" than it would be for a brand new pipeline. But not many people would embrace as a "substantial benefit" a recycled, 50-year-old hand-me-down for which they were charged the same price as (or "no higher" than) brand new.

What saves the Commission is that, as the court's opinion notes, *see* Slip Op. at 10, 15-16, a careful reading of the agency decision shows some actual benefit to ratepayers. While the Commission did not repeat its analysis in detail here, it did expressly rely on its earlier findings in issuing a certificate of public convenience and necessity that the proposed service would provide a number of benefits specifically to Missouri customers. Those benefits include improving the reliability and diversity of natural gas supply in the State and increasing competition. *See Missouri Interstate Gas, LLC* ("*Rehearing Order*"), 144 FERC ¶ 61,220 P 49 &

n.86 (2013); *Missouri Interstate Gas, LLC*, 100 FERC ¶ 61,312 PP 14–18 (2002). Importantly, petitioner never sought review of those prior findings, so both petitioner and this court are bound by them.

In addition, the record (just barely) documents the connection the Commission made between the avoided construction costs and anticipated lower rates for pipeline customers. *See Wisconsin Pub. Power, Inc. v. FERC*, 493 F.3d 239, 273 (D.C. Cir. 2007) ("Although FERC's wording may have been less than precise on this point, the agency's path may reasonably be discerned[.]"). As the Commission noted on rehearing, that cost differential will translate into a rate base that is lower than it would have been had a comparable pipeline been constructed, and it is that rate base that will serve as the foundation for the rates charged. *Rehearing Order* at P 55 n.93 (2013).[1]

To the extent there *could be* any question regarding the directness with which that reduction in the rate base would translate into lower prices for shippers, it would stem from distinct subsidization concerns that could arise if the Commission permitted the pipeline to charge customers a rate not linked directly to use of the new segment without measures in place to mitigate this risk. That scenario would distinguish this case from *Natural Gas Pipeline Co. of America*, 29 FERC ¶ 61,073 (1984), where the Commission

---

[1] While the Commission's precedent requires that the substantial benefit be established by "clear and convincing evidence," this court's review remains deferential. Because the Commission correctly identified the applicable "clear and convincing" standard, *see Rehearing Order* at P 35; *Remand Order* at P 44, this court reviews any findings of fact made pursuant to that standard only for substantial evidence. *See Sea Island Broadcasting Corp. of South Carolina v. FCC*, 627 F.2d 240, 244 (D.C. Cir. 1980).

specifically noted that charging rates for a newly acquired pipeline segment on an incremental basis ensured that the company, and not its customers, "b[ore] the risk of project failure or insufficient throughput." *See id.* at 61,151.

Here, however, the Commission addressed concerns regarding potential subsidization specifically in its 2007 rehearing decision approving the merger that created MoGas Pipeline, LLC. *See Missouri Interstate Gas, LLC*, 122 FERC ¶ 61,136 PP 67–75 (2007). No meaningful challenge to the rate design aspect of the Commission's decision or its implications for the benefits exception has been pressed here.

As a result, the court's opinion decides only that permitting the inclusion of an acquisition premium in the rates on this record in a Section 7 proceeding, 15 U.S.C. § 717f, was a tolerable application of the Commission's benefits exception. This decision says nothing about whether a future premium would or would not be sustainable if the subsidization argument were pressed and the measures the Commission took to address that risk were found wanting. Nor do we address whether future rates can be challenged on that ground in a Section 4 rate-setting proceeding, 15 U.S.C. § 717c.

More fundamentally, nothing in our decision today should be held as authorizing the Commission, going forward, to approve the inclusion of acquisition premiums based solely on a determination that rates for the refurbished pipeline will be "no worse than" if a new, modern pipeline had been built. If the Commission wishes to spell the demise of the strict actual-benefits test of past precedent and replace it with a wooden "new use plus marginally cheaper than new" rule, it must be up front about what it is doing and grapple directly with the question whether the statutory and regulatory

framework and past precedent permit such a regulatory metamorphosis.